Benito QUINTANA, Appellant,

v.

J. W. HOLLAND, District Director, Immigration & Naturalization Service, Philadelphia, Pa.

No. 12427.

United States Court of Appeals
Third Circuit.

Argued April 14, 1958.

Decided May 23, 1958.

John B. Brumbelow, Philadelphia, Pa. (Marvin Comisky, Wollman, Tracey, Schlesinger & Salus, Philadelphia, Pa., on the brief), for appellant.

Norman C. Henss, Asst. U. S. Atty., Philadelphia, Pa. (Harold K. Wood, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Harry A. Takiff, Philadelphia, Pa., Rowland Watts, of Md. Bar Staff Counsel, American Civil Liberties Union, Julian E. Goldberg, Counsel, American Civil Liberties Union, Greater Philadelphia Branch, Philadelphia, Pa., on the brief, for amicus curiæ.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves the rules concerning suspension of deportation for aliens and the rescission thereof. Plaintiff Quintana sought a declaratory judgment that the rescission of suspension of deportation as to him was void and that he was entitled to the status of an alien lawfully admitted for permanent residence. The district court entered summary judgment against the plaintiff, D.C.E.D.Pa.1957, 154 F.Supp. 640.

The plaintiff was born in Spain. He last entered this country in 1934,[1] coming ashore from a ship which was en route from Cuba to Spain. The ship departed without him and he remained in the United States and has been here ever since. In 1943 he was arrested by the Immigration & Naturalization Service and, after a hearing, found subject to deportation. However, the order issued pursuant thereto granted him the privilege of voluntary departure. The time for his departure was extended several times so that he was still present in this country when in 1947 he married a resident. In June of that year the Commissioner granted plaintiff's motion to reopen the record to permit him to apply for a suspension of deportation under Section 19(c) of the Immigration Act of 1917 as amended.[2] There was a recommendation to that effect approved by the Service December 3, 1947 and reported to Congress on December 15. In July 1948, following notice from the Immigration Service, the plaintiff paid the fee of $18.00 which, pursuant to the provisions of the then statute, was necessary for the establishment of a record of legal entry. This payment was received by the Service on July 22, 1948. On July 6, 1949, a congressional resolution granted the plaintiff the sought-for adjustment of status. The plaintiff's status as a lawful, permanent resident became fixed as of one of these dates. The Regional Commissioner and the Board of Immigration Appeals seem to have regarded July 22, 1948, as the date the plaintiff's status was adjusted under the provisions of the statute. For the point to be discussed below, we do not need to commit ourselves to a choice of these two dates.

The next step was taken on July 9, 1953. The District Director of the Serv-

---

1. Plaintiff had been here earlier but the earlier entry and departure is of no significance in this case.

2. 8 U.S.C.A. § 155(c) (1942), now §§ 1254 (a) (1, 2), 1351.

ice notified the plaintiff of the Government's intention to rescind his adjustment of status because his alleged membership in the Communist Party had made him ineligible therefor. However, the first officer assigned to make an inquiry into the matter reported a failure to establish the Communist charge. The case was reopened and further hearings were conducted by another officer on December 29, 1954 and February 23, 1955. A recommendation for rescission of the suspension was made. This was approved by the District Director March 30, 1955 and the Acting Regional Commissioner on April 11, 1955. This last named official is the one to whom the Attorney General, pursuant to the statute, has delegated his authority.[3] Following this approval the matter was submitted to Congress and on April 9, 1956, a concurrent resolution was passed withdrawing the suspension of deportation in the plaintiff's case. Plaintiff was notified, did not depart voluntarily and has been ordered deported.

We think the critical point in the case presented by the plaintiff is the question of timeliness of the proceedings to rescind his adjustment of status. The statute governs, of course, and its interpretation presents the question in this case. The relevant language is as follows:

"If, *at any time within five years* after the status of a person has been adjusted under the provisions of section 1254 of this title or under section 19(c) of the Immigration Act of February 5, 1917, to that of an alien lawfully admitted for permanent residence, *it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status,* the Attorney General shall submit to the Congress a complete and detailed statement of the facts and pertinent provisions of law in the case. Such reports shall be submitted on the first and fifteenth day of each calendar month in which Congress is in session. If during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, the Congress passes a concurrent resolution withdrawing suspension of deportation, the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. * * *"[4] (Emphasis added.)

The Acting Regional Commissioner, in his opinion and order, considered the proceedings timely because notice was given the plaintiff within five years after his adjustment of status as a permanent resident. The district judge thought that while the statutory language "appears to limit the time within which the Attorney General * * * has power to act," there is no limitation on Congress except a self-imposed one that it act during the session in which the question is posed to it or during the session following.

The Government in supporting the procedure followed by the Regional Commissioner and approved by the district court describes the provisions in the statute as directory only and not essential to the validity of action taken under them. Further, the Government says this is a matter of legislative grace within a field of congressional supremacy the disposition of which Congress has reserved for itself and the courts cannot either review or overrule an action taken by the Congress therein, notwithstanding failure to follow the procedure it has set out for itself. Like so many instances in legal arguments, these conclusions are

---

3. 8 U.S.C.A. § 1103, 8 C.F.R. § 246.12 (rev. ed. 1952), as amended, 19 Fed.Reg. 2180 (1954). See also Jay v. Boyd, 1956, 351 U.S. 345, 351 note 8, 76 S.Ct. 919, 100 L.Ed. 1242.

4. Immigration Act of 1952, § 246(a), 8 U.S.C.A. § 1256(a).

sound if the premises on which they are based are valid.

We take a different view of this statute than that of the district court in this case and Government's counsel in support of the court's ruling. That which is accomplished by a rescission of status is pretty harsh. It is comparable to the revocation of citizenship about which the courts have been very keen to make sure that the individual received careful protection.[5] The rescission blocks the man on the road to citizenship,[6] and results in banishment from a country where he may have lived a long time, as in this case. We think, therefore, that Congress meant to require the Attorney General to take the described action within five years and to be bound by that limitation itself.

▮▮▮ What is the described action the Attorney General must take? In our opinion the giving of notice within the five-year period is not enough.[7] The statute uses the words "it shall appear to the satisfaction of the Attorney General" and so forth. We think that something appearing to an officer's "satisfaction" means that he must have something more than a hunch about it,[8] or even more than that he may be convinced in his own mind. We think it means a reasonable determination made in good faith after such investigation and hearing as is required.[9] Here the Attorney General could have made no such determination by the end of the five-year period from the latest possible date that can be considered. As of that time the only investigation had concluded negatively and the Service was engaged in seeking further evidence with which to convince an inquiry officer that the plaintiff had improperly secured his status. We are, therefore, of the view that the statute has not been followed in this case.

The Government argues that the rescission was here granted by a congressional resolution and asks who is a court to say that Congress, admittedly having control over this matter, cannot act as it pleases despite what it has put into the 1952 statute. We disclaim any attempt to interfere in a matter in which Congress has exclusive authority. It is our business, however, when a statute creates rights, to see that those rights are protected. This is not interference with

5. See United States v. Zucca, 1956, 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964; Bindczyck v. Finucane, 1951, 342 U.S. 76, 72 S.Ct. 130, 96 L.Ed. 100; cf. United States v. Minker, 1956, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185; Schneiderman v. United States, 1943, 320 U.S. 118, 159, 63 S.Ct. 1333, 87 L.Ed. 1796. See also Barber v. Gonzales, 1954, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009, and the recent expatriation cases; Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630; Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603; Mitsugi Nishikawa v. Dulles, 1958, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659.

6. 8 U.S.C.A. §§ 1427, 1429. In fact, it is specifically made a ground for revocation of a naturalization obtained on the strength of the suspension. Id. § 1256.

7. Cf. our two earlier decisions in Hughes v. Tropello, 3 Cir., 1924, 296 F. 306 and McCandless v. United States, 3 Cir., 1929, 33 F.2d 882.

8. See Webster, New International Dictionary 2220 (2d ed. 1939): Satisfy:

"To free from doubt, suspense, or uncertainty, to give assurance to; to set at rest the mind of; to convince. * *" See also State ex rel. Kirks v. Allen, Mo. App.1953, 255 S.W.2d 144, 149; State v. Chapman, 1890, 1 S.D. 414, 47 N.W. 411, 412.

9. This is the meaning that courts in various types of cases have given to the word when used in a statute. See National Ass'n of Securities Dealers, Inc., v. SEC, 3 Cir., 1944, 143 F.2d 62, 66; United States v. Lee Huen, D.C.N.D.N.Y.1903, 118 F. 442, 475; Toplis & Harding v. Murphy, 1943, 384 Ill. 463, 51 N.E.2d 505, 508; Ching Hong Yuk v. United States, 9 Cir., 1927, 23 F.2d 174, 175; United States v. Hrasky, 1909, 240 Ill. 560, 88 N.E. 1031, 1033; In re Davies' Adoption, 1946, 353 Pa. 579, 46 A.2d 252, 254; Coughran v. Markley, 1901, 15 S.D. 37, 87 N.W. 2, 3; cf. Erikson v. Ward, 1915, 266 Ill. 259, 107 N.E. 593 (construction contract); Kramer v. Philadelphia Leather Goods Corp., 1950, 364 Pa. 531, 73 A.2d 385, 386 (sales contract).

Congress or usurpation of congressional authority, but carrying out the judicial part of the legislative mandate.

█ What was the legislative mandate? It is found in the 1952 statute, a piece of legislation which passed House and Senate, was signed by the President and became a public law of the United States. Does the concurrent resolution relied upon in this case indicate a change of the Congressional mind, so that the time limit in the 1952 statute may be disregarded? We think not. If we are correctly advised, a concurrent resolution can no more change a statute than a statute may change a constitution. See, for example, the following:

"[W]hen the constituent bodies have united in a statute, a single House, by a mere resolution, cannot set aside and nullify the positive provisions of a law. [Citing.] A new law can do that, but nothing less than a law can." Visor v. Waters, 1936, 320 Pa. 406, 182 A. 241, 247.

"A concurrent resolution is one that is approved by both houses of Congress but is not sent to the President for signature. It, therefore, does not have the force of law; it merely expresses the intent of the two houses of Congress." Gross, The Legislative Struggle 205–06 (1953).

"In Congress, concurrent resolutions are used for matters not requiring presidential assent, such as ordering of printing—matters affecting only the two houses of Congress." Walker, Law Making in the United States 317–18 (1934).

"A concurrent resolution expresses facts, principles, opinions, and purposes of the two houses. It is without force and effect beyond the confines of the Capital and does not go to the President. Concurrent resolutions are used for collecting bills agreed to by both houses, for amending and recommitting conference reports, for fixing the time of final adjournment." Galloway, The Legislative Process in Congress 50 (1953).

"The simple resolution is essentially a formalized motion, participated in by the entire membership of a single house. Its greatest utility lies in providing a speedy manner by which the legislature may designate certain of its members to perform particular duties, to express recognition of outstanding services, * * * Most house procedure is established by means of the simple resolution.

"The concurrent resolution is merely a simple resolution which when published speaks for both houses of the legislature. * * *

"Joint resolutions more closely resemble actual laws. * * * The line between a law and joint resolution may not be clearly drawn. * * Joint resolutions may be used for many of the same purposes as simple and concurrent resolutions. * * *

"Occasionally the terms joint and concurrent are used synonymously. * * * [T]his is highly inaccurate and can lead to confusion." Horack, Legislation § 8, at 456–57 (1940).

In a paper called "Joint Resolutions are Laws," the author, Denys P. Myers of the Boston Bar, says:[10]

"Concurrent resolutions are not issued as slip laws, but are printed together in the appropriate volumes of Statutes at Large. The implication that they are a special form of law is scarcely to be doubted, but it is clear that they are not laws of the same character as acts and joint resolutions, which are approved by the President. Concurrent resolutions, though passed by the concurrence of both houses of Congress as the name shows, are not approved by the President. It follows that their effectiveness is limited to the authority which the Congress as a whole may be able to give them. The concurrent resolution is not appropriate, and is not used, for legislation in-

10. 28 A.B.A.J. 33, 35–36 (1942).

tended to have general effect. It may be doubted whether the President or the judiciary would feel themselves legally bound to observe a prescription contained in a concurrent resolution that was not itself provided for in an act or joint resolution."

So here, the statute created the pattern, and a concurrent resolution does not change it. We think the action in the case of this plaintiff came too late and was not in conformity with the statutory requirements. This conclusion makes it unnecessary to consider the other points raised by the appellant.

The judgment of the district court will be reversed and the case remanded for further proceedings in conformity with this opinion.