MATTER OF BARREIROS

In RESCISSION Proceedings

A-10953140

*Decided by Board May 21, 1964*

In rescission proceedings under section 246(a), Immigration and Nationality Act, the burden of proof rests with the Government to establish by a preponderance of reasonable, substantial, and probative evidence that respondent was ineligible for adjustment of status under section 245 of the Act.

Respondent appeals from the order of the special inquiry officer rescinding the adjustment to lawful permanent residence respondent received under section 245 of the Act (8 U.S.C. 1255 (1958)) on February 11, 1959; the trial attorney appeals from that portion of the special inquiry officer's order defining the Service's burden of proof. Respondent's appeal will be dismissed; the trial attorney's sustained.

We shall deal first with the issue as to the nature of the burden of proof in a rescission proceeding.

Section 246 of the Act (8 U.S.C. 1256 (1958)) under which the rescission proceeding was brought, reads in pertinent part as follows:

\* \* \* If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 245 or 249 of this Act or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling deportation in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this Act to the same extent as if the adjustment of status had not been made.

The special inquiry officer held that the Service which has the burden of proving that respondent had not been eligible for the adjustment can successfully meet its burden only by proof which convinces "almost, if not actually beyond a reasonable doubt" (p. 9, special inquiry officer's opinion); the trial attorney contends that the Service should carry no more than the usual burden of proof in civil proceedings; that is, the Service should be able to establish its case by a preponderance of the evidence. We believe the trial attorney has stated the rule properly.

536

The special inquiry officer based his conclusion on judicial and dictionary definitions of "satisfy". He has failed to take into account that other definitions exist; among these is one that in our opinion is even more appropriate to the situation before us than the definition he has relied upon. Definitions in judicial matters, for the most part, require the word "satisfy" when applied to burden of proof, to mean that something more than a preponderance of the evidence is involved (147 ALR 380-439 ("to the satisfaction of the jury")); however, in administrative matters, the weight of authority appears to be that the word is used to designate the individual who is to make the determination and to require him to make his determination in the manner that a reasonable man acting in good faith would. Illustrative of such use are the following cases:

*Quintana* v. *Holland,* 255 F.2d 161 (3d Cir., 1958) (a recision of suspension of deportation proceedings under the very section in issue here). The court interpreting the phrase "it shall appear to the satisfaction of the Attorney General" eliminating the possibility that it authorized the Attorney General to follow a subjective standard stated, "We think it means a reasonable determination made in good faith after such investigation and hearing as is required."

*National Association of Securities Dealer, Inc.* v. *SEC,* 143 F.2d 62, 66 (3d Cir., 1944). The court held that the phrase "establish to the satisfaction of the Commission" required an applicant to present substantial evidence to the Commission.

*O'Neal* v. *United States,* 140 F.2d 902, 912 (6th Cir., 1944). The court held that since a statute giving the President power to institute rationing when he is "satisfied" that a shortage exists, also gave him the power to investigate and administer the statute, the word "satisfied" was meant to be the equivalent of "finds".[1]

Since substantial authority exists in administrative matters for interpreting the "satisfied" phrase as the designation of a person who is to make a finding on a certain objective standard—the standard of a reasonable man acting without bias, and since reasonable men (juries for example) daily make findings on important issues by a preponderance of the evidence, and since the preponderance rule is the usual one in civil matters, the special inquiry officer's departure from the usual standard can be accepted only if some strong reason justifying a departure is set forth.

No reason in the history of the legislation is given. We find none. The Senate committee describing the section stated that it called for rescission in those cases where "it shall appear to the Attorney General" that the person was ineligible (S. Rep. No. 1137, 82nd Cong., 2d Sess.

---

[1] Illustrative of still another use: *Montgomery* v. *Ffrench,* 299 F. 2d 730, 735 (8th Cir., 1962). The court held that a law requiring a petitioner to "establish to the satisfaction of the Attorney General" that he would give proper care to an orphan he desired to bring to the United States, gave the Attorney General a discretion to act which would not be reviewed by the court.

26 (1952)). The House committee stated that the section provides for rescission "when subsequently found [by the Attorney General] that the alien was not, in fact, eligible for adjustment." (H.R. Rep. No. 1356 (82nd Cong., 2d Sess. 63 (1952)). The commentary on the Immigration and Nationality Act found at 8 U.S.C.A. p. 71 states that the section permits rescission "when it is found that the person was in fact not eligible". There is thus no indication in the history of the legislation that a departure from the usual burden of proof in deportation proceedings was intended.

The dictionary definition relied upon by the special inquiry officer does not support his position that something just short of proof beyond a reasonable doubt is required; his own standard falls short of that demanded by the definition. This dictionary definition defines "satisfy" as "to free from doubt, suspicion, or uncertainty; to give full assurance; to set at rest the mind of; to convince"; even proof beyond a reasonable doubt leaves room for some doubt or suspicion or uncertainty, and the special inquiry officer calls for less than proof beyond a reasonable doubt.

One other aspect should be considered: Does the nature of an administrative rescission proceeding call for a higher standard of proof than the usual one in administrative matters? We think not. The issue in the rescission proceeding is not too different from that in the deportation proceeding where the question often is whether an alien legally in the United States is entitled to remain; and, the issue in the rescission proceeding is in the abstract not as important as is the issue in the administrative expatriation proceeding where the issue is whether United States citizenship has been lost. Yet, in both the deportation and the expatriation proceeding, the burden upon the Service is to establish its case by no more than a preponderance of evidence. (In fact, Congress enacted legislation to clarify its intent that no greater burden was to be borne in the expatriation matter (section 349(c) of the Act, 8 U.S.C. 1481(c) (Supp. IV).)

Thus, considering the history of the legislation, the judicial decisions, the dictionary definition and the nature of the proceeding, we find no reason for placing a greater burden upon the Attorney General in rescission proceedings than has been placed upon him in deportation matters. We conclude the Service must establish its contention in this rescission proceeding by a preponderance of evidence which is reasonable, substantial and probative.

We may now deal with the factual situation. Respondent, a 28-year-old married male, alien, a native and citizen of Portugal, was admitted as a visitor on April 8, 1957 for a period of six months. On May 5, 1958, his status was changed to that of a student and he was authorized to remain in the United States until April 12, 1959. On

September 5, 1958, he married Margaret Preston, a citizen. On December 23, 1958 she filed a visa petition on respondent's behalf; the petition was approved on February 10, 1959. On the same date, respondent filed an application to acquire the status of a lawful permanent resident under section 245 of the Act. The application was granted by order of the District Director on February 11, 1959.

Prior to January 12, 1962, the respondent was acquitted on a federal indictment charging him with committing a fraud against the United States in that his marriage was not a bona fide one. On January 12, 1962 respondent divorced his wife. On January 17, 1963 the Service served the respondent with a notice that it intended to rescind the adjustment of status which he had received on February 11, 1959. The basis for the rescission was the allegation that his marriage had been entered into solely for the purpose of obtaining the adjustment of status, and that it had not resulted in a bona fide husband and wife relationship. On December 17, 1963 after a hearing begun on July 10, 1963, the special inquiry officer entered the order from which the respondent and the Service appeal.

The Service contends that George Silva, respondent's friend, married Priscilla Ann Muller for the sole purpose of obtaining an adjustment of his status based upon his wife's citizenship, that he introduced respondent to Priscilla's girl friend, Margaret Preston, that Margaret agreed to marry the respondent for $300 with the understanding that she would not live with the respondent, that she would not be a wife to him, and that she would be given a divorce after respondent had become a lawful permanent resident of the United States. Margaret appeared as a Service witness and George Silva as a witness for respondent. The Service presented John Warick and Emil Neto, residents of the apartment house in which respondent allegedly lived with Margaret.

The respondent denies that his marriage was other than a bona fide one. He testified that he married Margaret in good faith, that he lived with her for a three-year period from the time he married her, and that he supported her. Respondent presented Mrs. Silvina Noguera who testified she visited the respondent and Margaret at their apartment on nine or ten occasions, two photographs of Margaret offered to show that she was an attractive woman with whom a man would well be desirous of entering into a bona fide relationship, a post card written by Margaret to the respondent's mother, two letters purportedly from Margaret asking the respondent for money, and a bank book to establish that he could not have made a payment to Margaret for marrying him.

The special inquiry officer considering the demeanor, interest, and bias of the respondent and his witnesses concluded that they were not

credible witnesses. He stated that Margaret was a person who had engaged in immoral and illegal activities, that she had testified falsely in regard to other matters, and that she had lived in a homosexual relationship with Priscilla, but he concluded she had testified truthfully at the deportation hearing.

Respondent testified that after the marriage, he and his wife had lived at 51 Madison Street, Newark, New Jersey, for three years, and that in this period she had been absent from the apartment visiting friends about 50 days, a total which includes 30 days in 1960 during which respondent himself was outside the United States visiting in Portugal. Respondent's wife denied that she had ever lived with him at the apartment. She admitted that she had been there on two occasions in connection with some business she had with the respondent.

Let us examine the testimony on this issue in detail. Respondent testified that sometime before the marriage he found an apartment that was about to be vacated (p. 21), and that the day before the marriage, he attempted to obtain possession of the apartment but could not because it was not to be vacated for another week or two (p. 22). After the marriage, respondent and his wife went to a show in New York and then to a hotel (p. 22), they stayed there for a day or two (p. 32), then came to Newark where they spent the night in his cousin's house (pp. 35-36). From his cousin's house, they went either to a hotel or to 51 Madison Street (p. 36) where the apartment was located.

At a later hearing (September 23, 1963), respondent was again questioned concerning his actions immediately after the marriage. He testified that he and Margaret had stayed in the New York hotel a few days (pp. 291-292), that they went to a Newark hotel for two nights, and that they had then gone to the apartment (pp. 292-4).

Silvina Noguera, respondent's cousin, testified that the respondent had brought his wife Margaret to her house, that they had come about two or three days after the wedding (p. 183), that they did not stay long on that occasion, that she took them shopping to buy clothes for Margaret, and that she then drove them to their apartment at Madison Street (pp. 183-184). Mrs. Noguera was not questioned as to whether the respondent and his wife stayed overnight, and the respondent was not questioned concerning the conflict between his testimony that he stayed overnight at Mrs. Noguera's and her testimony that they had only spent a few hours there when he visited after the wedding.

On July 10, 1963, respondent testified that his wife had lived with him for three years, being absent from him for short visits and on the occasion when he visited to Portugal; he stated that he left for work 11:00 o'clock at night and that she would sometimes leave the house around 10 or 10:30 to visit friends while he was working, and that ex-

cept for the times she left him to visit, she resided with him in the same house day after day as man and wife (pp. 27–9, 32–3, 36–8, 44–5). On September 23, 1963 respondent testified that except for Margaret's brief visits, she was always at the apartment with him, although she apparently spent nights away because he worked in the nighttime (pp. 294–5) and that she was with him "sometimes in the daytime" (p. 295). He repeated that his wife had been with him more times than she had been out (p. 300), that she had left her clothing at the apartment even when she was absent for a few days (p. 305), that the total absences amounted to about 40 or 50 days (p. 307), that when she did go out, she sometimes went Tuesday or Friday, that sometimes she left Friday and stayed away until Monday, but that most Saturdays she spent in the apartment (p. 308).

Respondent's former wife, Margaret, testified she had not stayed overnight at the home of respondent's cousin, and that she had never lived with him at 51 Madison Street but that she had been there about a month after the marriage to sign some papers (p. 126). This witness, besides being a call girl, displayed such a disregard for truth in executing documents under oath in connection with adjusting the respondent's status to that of a permanent resident that no credence can be given her uncorroborated testimony. The testimony of Priscilla cannot be considered as corroboratory because Priscilla herself is not credible without some corroboration of her testimony.

There is some corroboration for Margaret's testimony that she did not stay with respondent overnight, at the home of respondent's cousin since respondent's cousin stated that their visit had been a short one, that she had taken them shopping, and that she had taken them home to the Madison Street address.

There is some corroboration of Margaret's testimony that she did not reside with respondent at 51 Madison Street; this is in the form of two letters coming from Margaret. The first letter (undated but written before August 1, 1959) informs respondent that Margaret is in Long Island without money and that his remittance of $2.00 was no help to her in buying food, paying for the rent, purchasing gas or taking care of her two dogs, and that she needed $100 (Ex. 11, pp. 131, 133–4). The second letter, dated August 1, 1959, recalls the destitute circumstances in Long Island; it states that Margaret had lost both her dogs and practically everything she owned, that she had to hike back to New York, that she was "on 69th again and had to start from scratch", and that she wanted a divorce (Ex. 21, pp. 150–1). (A third letter (Ex. 23) is undated and it cannot be determined whether it was written while the parties were supposed to be living together.)

We find in these letters corroboration of Margaret's testimony that she had not lived with respondent. If as the respondent testified,

Margaret dwelt with him daily except for short visits to friends it is difficult to understand why she had to write to him for money and why he was expected to send her money instead of just giving it to her. Moreover, the letter showing that Margaret was living in Long Island, with her TV set and other possessions and that she had to "pay rent" (Ex. 11), and the letter stating that Margaret had lost practically everything she owned, that she was 69th again, and that she had to start from scratch (Ex. 21) are hardly the letters of one who was merely away from Madison Street on a short visit to friends.

Some corroboration of the claim that Margaret did not live with respondent is seen also in the following: Margaret's presence in Newark was made necessary by the Service request that she appear for an interview in connection with her visa petition on February 10, 1959; she signed a joint income tax return for 1958 on the same date (Ex. 17). This coincidence raises a question as to whether Margaret was available to the respondent as he claimed daily, or whether he took advantage of her presence in Newark for immigration purposes to have her sign the return.

We do not find any substantial conflict between Margaret's testimony on this issue and the testimony of the two witnesses who were respondent's cotenants. The respondent stated that his neighbor in the apartment across from him must have seen Margaret on many occasions because of the number of times Margaret was there and that the witness had probably seen Margaret when he came into respondent's apartment. This neighbor testified that he had seen Margaret on only two occasions and both occasions had been shortly after the respondent had moved into the apartment. The tenant on the ground floor testified he had seen respondent but had never seen a woman enter respondent's apartment. He had heard footsteps indicating the presence of more than one person in respondent's apartment but could not identify the footsteps.

Counsel's attack upon the credibility of Margaret is well taken but we have credited only testimony which is corroborated. Respondent's acquittal on criminal charges based on facts which in turn are the basis for the charge here does not require dismissal of the deportation charge since the burden of proof in each case is different. Margaret's admission that she had relations with respondent on one occasion (for pay) does not make a bona fide marriage relationship exist where none was intended (pp. 132–3, 135); whether or not the possibility of blackmailing respondent was a factor in persuading Margaret to enter into the marriage need not be discussed in view of the proof here that respondent did not intend to enter a bona fide marriage relationship.

We believe that the Service has borne its burden of establishing by a preponderance of evidence that is reasonable, substantial and pro-

bative, that respondent entered into a marriage with Margaret Estelle Preston on September 5, 1958 at Elkton, Maryland solely to enable him to adjust his status to that of a permanent resident: no bona fide husband-wife relationship was intended and none resulted. Respondent was not eligible for the adjustment of status which he was granted by the District Director, Newark, New Jersey on February 11, 1959. The appeal of the respondent will be dismissed.

**ORDER:** It is ordered that the appeal of the respondent be and the same is hereby dismissed.