**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1849
_____

MOHAMMAD M. QATANANI,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF
AMERICA
_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS
(Agency No. A076-133-969)
Immigration Judge: Alberto J. Riefkohl
_____

Argued on May 13, 2025

Before: KRAUSE, MATEY, and FREEMAN, *Circuit Judges*

(Opinion filed: July 15, 2025)

Cyrus D. Mehta
David A. Isaacson **[Argued]**
Cyrus D. Mehta & Partners
One Battery Park Plaza, 9th Floor
New York, NY 10004

Claudia Slovinsky
233 Broadway Suite 2020
New York, NY 10279

*Counsel for Petitioner*

Merrick B. Garland
Gregory M. Kelch
Lindsay M. Murphy **[Argued]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

**OPINION OF THE COURT**
_____

FREEMAN, *Circuit Judge*.

The Supreme Court has long recognized that the admission and exclusion of noncitizens is a "fundamental sovereign attribute exercised by the Government's political

departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)). But in that endeavor, both political branches have particular roles to play. On the one hand, the Executive has authority to enforce the immigration laws passed by Congress and to exercise the discretion Congress delegates to it. *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983). On the other hand, "the formulation of [immigration] policies is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see also Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 176 (3d Cir. 2018). Indeed, there is "no conceivable subject" over which the "legislative power of Congress [is] more complete" than the admission and exclusion of noncitizens. *Fiallo*, 430 U.S. at 792 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). In this balance, it is the Judiciary's exclusive province to resolve separation-of-powers questions. *See Freytag v. Comm'r*, 501 U.S. 868, 878–80 (1991); *Mistretta v. United States*, 488 U.S. 361, 380–82 (1989). So where an administrative agency purports by regulation to evade procedures mandated by Congress in the Immigration and Nationality Act ("INA"), it is incumbent upon us to intervene. We do so here.

In 1996, Mohammad M. Qatanani was admitted to the United States on a work visa. In 1999, he applied under 8 U.S.C. § 1255(a) to adjust his immigration status to that of a Lawful Permanent Resident ("LPR"). After lengthy proceedings regarding Qatanani's application, an Immigration Judge ("IJ") twice made fact findings and credibility determinations in Qatanani's favor and granted his application to adjust to LPR status. The IJ issued those orders in 2008 and 2020, respectively.

The IJ's 2008 order never became final; the Department of Homeland Security ("DHS") appealed the order within the 30-day period permitted for it to do so. On appeal, the Board of Immigration Appeals ("BIA") vacated the IJ's order and remanded the matter to the IJ for further proceedings. Those proceedings led to the IJ's April 2020 order that again granted Qatanani's application to adjust to LPR status.

DHS did not appeal the IJ's April 2020 order within 30 days, so that order became final. As part of Congress's regime for adjustment to and recission of LPR status, the Attorney General was then required to memorialize that final order by recording Qatanani's admission with LPR status as of the date of the IJ's April 2020 order. 8 U.S.C. § 1255(b). And Congress specified how the Attorney General could rescind that LPR status if warranted: Within five years of the adjustment date, the Attorney General could commence proceedings pursuant to § 1256(a).

But here, the Attorney General evaded that statutory path. Instead, the BIA invoked an agency regulation to "self-certify" an appeal of the IJ's April 2020 order eleven months after that order issued. And at the conclusion of those self-certified appeal proceedings, the BIA issued an order purporting to reverse the IJ's April 2020 order and to order Qatanani removed from the United States. Qatanani petitioned us for review of the BIA's decision.

The BIA exceeded its authority when it attempted to undo Qatanani's adjustment to LPR status by using an agency regulation in a manner inconsistent with the procedures set out

4

by Congress in the INA.  Accordingly, we granted Qatanani's petition for review and vacated the BIA's order.[1]

## I.

Qatanani is Palestinian and a citizen of Jordan.  He was born in the West Bank and lived there until he finished high school.  In 1982, he began studying at the University of Jordan, where he earned his bachelor's and master's degrees and a Ph.D.  In 1989, he began working as an Imam in Jordan.

In 1993, Qatanani traveled to the West Bank with his wife and children to renew his residency card.  While there, he was detained, beaten, and interrogated by the Israeli military.  Upon his release, Israeli authorities renewed Qatanani's residency card.

In 1996, Qatanani was admitted to the United States, along with his wife and then four children, on a non-immigrant H1-B visa to serve as an Imam at the Islamic Center of Passaic County ("Islamic Center") in Paterson, New Jersey.  In 1998, the Immigration and Naturalization Service determined that Qatanani was eligible to receive an immigrant visa.  *See* 8 U.S.C. § 1101(a)(27)(C).  On April 1, 1999, when his H1-B visa was set to expire, Qatanani applied to adjust his status to LPR.  On his application form ("I-485 application"), Qatanani checked a box stating that he had not been arrested or

---

[1] On May 19, 2025, we issued a Judgment granting Qatanani's petition for review and vacating the BIA's decision and its order of removal.  We noted that a full opinion would follow.  We now issue that opinion.

5

imprisoned for violating a law or ordinance within or outside the United States.

In 2005, while his I-485 application was still pending, Qatanani requested a meeting with the Federal Bureau of Investigation ("FBI") and Immigration and Customs Enforcement ("ICE") to inquire about the reason for the delay. In February 2005, an FBI agent and an ICE agent conducted a voluntary interview in which Qatanani disclosed that the Israeli military detained him in the West Bank in 1993. The agents informed United States Citizenship and Immigration Services ("USCIS") that Qatanani had been arrested and possibly convicted in the West Bank, and officials reached out to Israeli authorities to obtain records.

In May 2006, USCIS interviewed Qatanani regarding his I-485 application. The USCIS officer presented a declaration executed in January 2006 by the FBI agent who conducted the February 2005 interview. Qatanani and his counsel, who were seeing the declaration for the first time, objected that its contents were inaccurate and that they needed more time to review the document. The interview was terminated soon thereafter, and there was no subsequent USCIS interview.

In July 2006, USCIS denied Qatanani's I-485 application. It stated that Qatanani was inadmissible because he made a material misrepresentation in his application. *See* 8 U.S.C. § 1182(a)(6)(C)(i). Relying on the FBI agent's declaration, USCIS found that, in the February 2005 interview, Qatanani admitted that he was arrested, pleaded guilty to a crime, and was imprisoned for three months by Israeli authorities in the West Bank in 1993. Accordingly, USCIS

6

found that Qatanani made a material misrepresentation when he stated on an immigration form that he had never been arrested, charged, or imprisoned for violating any law or ordinance. USCIS also denied Qatanani's application in the exercise of discretion.

That same day, ICE placed Qatanani in removal proceedings. Qatanani appeared before the Newark Immigration Court and conceded his removability. As relief from removal, he renewed his request for adjustment of status before the Immigration Court.

After receiving voluminous documents in evidence and holding a hearing over four days, the IJ granted Qatanani's application for adjustment of status. In a lengthy opinion issued in 2008, the IJ found that Qatanani was admissible and that he merited adjustment of status as a matter of discretion.

The IJ rejected the two grounds upon which DHS claimed that Qatanani was inadmissible. The first ground was alleged engagement in terrorist activity. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I). Specifically, DHS claimed that Qatanani provided material support to Hamas. DHS based this claim in large part on documents it obtained from the Israeli military. Those documents state that, in 1993, a military court convicted Qatanani of two charges: (1) membership in an unlawful association (specifically, Hamas) and (2) performing a service for an unlawful association.

The IJ conducted a detailed discussion of the evidence. Among other concerns, the IJ stated that the documents from the Israeli military were premised on a written confession that was absent from the record. The IJ found that the military court

7

was internationally stigmatized for failing to meet fair-trial standards, and even the Israeli Supreme Court had condemned it for abusive treatment to coerce confessions from detainees during the time of Qatanani's detention. The IJ also found it "perplex[ing]" and "remarkable" that the Israeli military would convict Qatanani (who refused to cooperate or become a spy for Israel) of being a member of Hamas and then release him after three months and renew his West Bank residency permit. App. A160. Because the military court documents were "highly questionable, fail to clarify the identity of the respondent[,] and border on being, flatly stated, unreliable," the IJ gave the documents "very low evidentiary weight." App. 150. He found they did not prove Qatanani engaged in terrorist activity.

In addition to the military court documents, two DHS witnesses—the FBI agent and the ICE agent who interviewed Qatanani in 2005—testified that Qatanani admitted during the interview that he was arrested for being a member of Hamas. In Qatanani's own testimony, he maintained that he had not done so. The IJ found Qatanani credible. But the IJ recounted numerous examples of the FBI agent's evasive, unresponsive, implausible, and contradictory answers that caused the IJ to disregard the FBI agent's testimony as unreliable. The IJ also explained that the ICE agent contradicted herself in her testimony, which was further undermined by DHS's failure to present the documents the ICE agent reviewed to prepare for her testimony. As a result, the IJ did not credit either agent, leaving Qatanani as the "only one of the three that has been consistent" about whether he was detained in 1993 or whether he was arrested and convicted. App. A172.

8

The other grounds DHS raised to support its allegation that Qatanani engaged in terrorist activity were Qatanani's possible associations with members of Hamas and his one-time transfer of money to the West Bank. But, upon review of the evidence, the IJ found none of Qatanani's associations were improper, and DHS presented no evidence that the money Qatanani transferred to the West Bank came from an illegal source or was used for an illegal purpose. So the IJ found that Qatanani was not inadmissible for having engaged in terrorist activity.

The IJ then turned to DHS's second allegation of inadmissibility: the alleged willful misrepresentation of a material fact in Qatanani's application for adjustment of status. 8 U.S.C. § 1182(a)(6)(C)(i). The IJ found that Qatanani made no willful misrepresentation. Again crediting Qatanani's testimony, the IJ found that Qatanani "answered truthfully in his I-485 application for adjustment of status when he marked the box indicating that he was never arrested or convicted in any country." App. A188.

The IJ analyzed the distinction between arrest and administrative detention under the Israeli military court regulations in effect in the West Bank in 1993. Arrest required reasonable suspicion of an offense, while administrative detention required neither reasonable suspicion nor a criminal charge. The IJ credited the testimony of the experts presented by Qatanani and DHS, all of whom testified that thousands of Palestinian men were subject to administrative detention in the Israeli-occupied territories in 1993. Considering these facts, and Qatanani's credible testimony, the IJ found that Qatanani reasonably believed he was administratively detained without arrest in the West Bank in 1993. The IJ also found that

9

Qatanani was released without explanation and only learned during the USCIS interview that he allegedly had been convicted of a crime in 1993.

Although the IJ "d[id] not find that Mr. Qatanani willfully misrepresented a fact material [sic] in his application for adjustment of status," the IJ noted that "[i]t was unwise for Mr. Qatanani to not be candid on his application about his detention in the West Bank in 1993." App. A192. The IJ posited that, if Qatanani had explained the circumstances when he applied for adjustment of status, he might have avoided the lengthy proceedings about his admissibility. Nonetheless, because Qatanani voluntarily disclosed his detention to the FBI during the February 2005 interview, the IJ found that Qatanani's conduct did not cut off a line of inquiry relevant to the application for adjustment of status.

Having found Qatanani eligible for admission, the IJ addressed whether Qatanani merited adjustment to LPR status as a matter of discretion. The IJ weighed several factors in Qatanani's favor, including the "outstanding" character witnesses who took time out of their schedules to testify at the hearing. App. A190. Those witnesses included three law enforcement officers—two county sheriffs and an Assistant United States Attorney who was the then-Chief of the Criminal Division in the United States Attorney's Office for the District of New Jersey—who testified to the assistance Qatanani provided to federal and local law enforcement during his tenure at the Islamic Center. Additionally, three respected members of Jewish and Christian religious organizations each "attested to [Qatanani's] character and dedication to an all[-]inclusive movement and message of tolerance and unity among all denominations." *Id.* The IJ also weighed positively that

10

Qatanani's family—his wife and six children, three of whom were United States citizens—had lived in the country as law-abiding members of the community for over 12 years. The only negative factor was a criminal charge (which had since been dismissed) Qatanani sustained for producing an invalid international driver's license to a police officer during a traffic stop in 2005. Because that negative factor did not outweigh all the positive factors, the IJ granted Qatanani's application and adjusted his status to LPR.

DHS timely appealed to the BIA. In a 2009 opinion, the BIA remanded the matter to the IJ for additional evidentiary proceedings. The BIA determined that the IJ improperly discredited the FBI and ICE agents, but it did not disturb the IJ's determination that Qatanani testified credibly. Additionally, the BIA instructed the IJ to further evaluate the documents DHS obtained from the Israeli military because, "[a]lthough the documents may have deficiencies, [they] appear to relate to the lead respondent" and "reasonably indicate the existence of a criminal conviction." App. A121–22.

Upon remand, the parties submitted additional evidence and argument, and the IJ heard testimony over three dates in 2016 and 2017. (During those proceedings, DHS specifically refused to present the FBI and ICE agents to be rehabilitated.) In April 2020, the IJ again granted Qatanani's application for an adjustment to LPR status. In his decision, the IJ found that Qatanani had established his admissibility and merited relief as a matter of discretion.

Contrary to DHS's charge that Qatanani had engaged in terrorist activity, the IJ found that Qatanani is not and has never

11

been a member of Hamas. Upon remand from the BIA, DHS supported this charge by relying only on the Israeli military documents showing Qatanani's alleged conviction by the Israeli military. The IJ found those documents not credible because they were obtained by a fundamentally unfair process. The IJ assumed without deciding that Qatanani signed a written confession to being a member of Hamas,[2] and the IJ found that Qatanani only signed the confession because the Israeli military used torturous interrogation tactics to coerce him into doing so. The IJ also found that if Qatanani signed a written confession at all, Qatanani did not understand what he was signing. So the only basis for the alleged conviction was a coerced and unknowing confession.[3] Thus, the IJ found that Qatanani proved by clear and convincing evidence that he was not inadmissible for engaging in terrorist activity.

The IJ also found that Qatanani proved he was not inadmissible for making a material misrepresentation in his I-485 application. The IJ explained (per the BIA's instruction) that Qatanani's failure to disclose his administrative detention in the West Bank tended to shut off a line of inquiry relevant to his eligibility for adjustment; thus, the omission was a material misrepresentation. But under BIA precedent, the burden then shifted to Qatanani to prove that he would have

_____

[2] The IJ noted Qatanani's testimony that one of the signatures on the written confession looked like his own and the other looked like an attempt to copy his signature.

[3] The IJ also noted that DHS never produced original records of the alleged conviction and relied instead on "a series of alleged certifications" by Israeli authorities that the IJ found was "tantamount to hearsay over hearsay." App. A63 n.5.

12

been admissible had the facts been disclosed. And the IJ found that Qatanani met his burden by presenting "overwhelming evidence, both in the record and through witness testimony, that [he] was tortured into making a confession of guilt," so Qatanani would have been admissible if he had disclosed his detention. App. A65.

Turning to the exercise of discretion, the IJ recounted a list of positive factors, including Qatanani's good moral character, substantial period of residence in the United States, significant community ties, consistent payment of his taxes, and contributions to religious and academic institutions. The IJ then turned to a topic DHS raised during the post-remand proceedings: a speech Qatanani gave during a rally in Times Square in December 2017.

In his brief speech, Qatanani stated his opposition to President Trump's decision to recognize Jerusalem as the capital of Israel. DHS argued that the speech was an adverse factor because a certain phrase Qatanani used during that speech—a call for "a new intifada"—equated to a call for violence. (DHS presented the IJ with a videorecording and a transcript of the speech.) For his part, Qatanani maintained that he was not advocating violence, and that he only promotes peaceful methods of political opposition.

After reviewing the contents of the speech and related materials from the parties, the IJ found that Qatanani was expressing his opinion about the President's decision by means

13

of a peaceful demonstration.[4]  Accordingly, the IJ did not consider the speech to be an adverse factor.

In an order dated April 27, 2020, the IJ granted Qatanani's application for adjustment to LPR status. According to the Immigration Court's certificate of service, the IJ's order was served on DHS by the Executive Office for Immigration Review via mail and personal service on the day the order was issued.

---

[4] Qatanani opened his speech by addressing "every good man and woman in the world who loves justice, who loves peace." A.R. 1410.  Midway through the speech, he said:

> Brothers and sisters.  Palestine is the heart of all Muslims.  The heart of all Arabs.  The heart of all the people in the world!  It is for every good man and woman in the world who loves justice, [cough] who loves peace.  Our message to Palestinian Authority: you have to stop all kinds of peace process!  No peace process and negotiation without liberation in Palestine.  Also has to be stopped and to be finished.  We have to start a new intifada.  [Uprising]  Intifada, intifada!

*Id*. (bracketed text in original).  He and the crowd then exchanged several chants of "Intifada, intifada!" before Qatanani concluded the speech by saying, "Brothers, this is the answer to Mr. Trump.  We will continue, we will continue coming to Times Square until Jerusalem will be free.  Until every place in the world to be free.  Thank you very much." *Id.*

Thus, pursuant to 8 C.F.R. § 1003.38(b), DHS had 30 days to file its notice of appeal with the BIA. But it did not do so. Instead, more than three months later, it filed a motion asking the BIA to hear a late appeal of the IJ's order. DHS filed its motion on August 12, 2020, and invoked a regulation that, according to DHS, permits the BIA to hear an appeal "by certification" in any case over which it has appellate jurisdiction. 8 C.F.R. § 1003.1(c) (2020). The regulation provides no time limit on the BIA's authority to self-certify a late appeal. DHS asserted that certification was warranted because it first learned of the IJ's April 27 order on July 14—one day after its physical office in Newark reopened following a COVID-19 closure. Over Qatanani's opposition, the BIA self-certified the appeal on March 10, 2021.[5]

---

[5] After DHS filed its motion, a new regulation temporarily removed the BIA's ability to self-certify appeals to itself under 8 C.F.R. § 1003.1(c). *See* Appellate Procedure and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588 (Dec. 16, 2020). The new regulation took effect on January 15, 2021, but a district court enjoined it on March 10, 2021—the same day the BIA self-certified an appeal in Qatanani's case. *Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 980 (N.D. Cal. Mar. 10, 2021).

Another regulation restored the BIA's self-certification authority, effective on July 29, 2024. *See* Efficient Case and Docket Management in Immigration Proceedings, 89 Fed. Reg. 46742 (May 29, 2024). By that time, the BIA had issued its opinion in Qatanani's case.

15

On April 5, 2024, the BIA issued an order that purported to (1) reverse the IJ's decision granting Qatanani's application for adjustment to LPR status and (2) order Qatanani removed to Jordan. In its opinion, the BIA declined to address Qatanani's admissibility. Instead, it overturned the IJ's exercise of discretion, finding that four adverse factors outweighed the positive factors. The adverse factors it relied upon were (1) Qatanani's "lack of candor in his application for adjustment of status . . . regarding his detention in the West Bank in 1993," App. A6; (2) that he had "associated with individuals who support[ed] Hamas," App. A7; (3) his Times Square speech, which the BIA characterized as "advocat[ing] for a violent, armed uprising against another sovereign nation," App. A8; and (4) his insufficient response to DHS's argument on appeal that he did not prove he filed tax returns for the years 2011 through 2016, App. A9.

This timely petition for review followed.

## II.[6]

Qatanani brings an as-applied challenge to the BIA's authority to self-certify an appeal of the IJ's April 2020 order granting his application for adjustment to LPR status. In doing

---

[6] We have jurisdiction to review a final order of removal, 8 U.S.C. § 1252(a)(1) and (5), and to determine whether a petitioner has LPR status, *see Sharkey v. Quarantillo*, 541 F.3d 75, 91–92 (2d Cir. 2008). When an agency has acted, we have jurisdiction to determine whether it exceeded its statutory powers. *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 129 (3d Cir. 2012). We review the BIA's legal conclusions de novo. *Pesikan v. Att'y Gen.*, 83 F.4th 222, 227 n.7 (3d Cir. 2023).

so, he contends that the BIA used a regulation, 8 C.F.R. § 1003.1(c), to circumvent Congress's process for rescinding a grant of LPR status and the procedural protections afforded by that process. He is correct that the BIA exceeded its authority in this case. The IJ issued his April 2020 order pursuant to 8 U.S.C. § 1255(a). When DHS did not appeal that order within 30 days, the order became final, with an effective date of April 27, 2020. *See* 8 U.S.C. § 1255(b). And once that appeal period passed and Qatanani obtained LPR status, if the government wished to revoke that status, it was required to adhere to the recission process Congress provided in 8 U.S.C. § 1256(a). The BIA lacked authority to usurp that process by self-certifying an appeal of the IJ's April 2020 order adjusting Qatanani's status.

## A.

We begin with first principles. "Policies pertaining to the entry of [noncitizens] and their right to remain here are peculiarly concerned with the political conduct of government." *Galvan*, 347 U.S. at 531; *Fiallo*, 430 U.S. at 792 (recognizing that "the power to expel or exclude [noncitizens] [i]s a fundamental sovereign attribute exercised by the Government's political departments" (quoting *Shaughnessy*, 345 U.S. at 210)). But our Nation does not vest that power in only one of our political branches. Instead, it is "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982). And "the creation of statutory rights associated with a given immigration status falls exclusively within the purview of Congress." *Osorio-Martinez,* 893 F.3d at 172.

The question here is one that is peculiarly in the province of the Judiciary: "whether . . . the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012) (quoting *Freytag*, 501 U.S. at 878); *see also Mistretta*, 488 U.S. at 380. The answer to that question depends on what authority Congress delegated to the Executive. *See Chadha*, 462 U.S. at 953 n.16 ("Executive action under legislatively delegated authority . . . is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review . . . .").

In the INA, Congress set out a comprehensive framework for the adjustment to and recission of LPR status. *See, e.g.*, 8 U.S.C. §§ 1255–56. Within the parameters of the INA, it granted the Attorney General the authority to adjust a noncitizen's status to that of an LPR "in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255(a); *see also Pinho v. Gonzales*, 432 F.3d 193, 203 (3d Cir. 2005). The INA specifies which groups of noncitizens are eligible for adjustment to LPR status, 8 U.S.C. § 1255(a) (limiting eligibility to noncitizens lawfully admitted or paroled to the United States or noncitizens who have been approved for a classification under the Violence Against Women Act), and it lists certain prerequisites for that adjustment, *id.* (requiring that an immigration visa be available, that the noncitizen apply for adjustment, and that the noncitizen be eligible for an immigrant visa and admissible to the United States).

As relevant here, the Attorney General has delegated to the presiding immigration judge the "exclusive jurisdiction to adjudicate any application for adjustment of status" filed by "any alien who has been placed in deportation proceedings or

in removal proceedings." 8 C.F.R. § 1245.2(a)(1)(i). Once that immigration judge issues a decision in the removal proceeding, a party has 30 days to appeal that decision to the BIA. 8 C.F.R. § 1003.38(b). "Except when certified to the Board, the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first." 8 C.F.R. § 1003.39 (2020).

When the IJ's grant of status adjustment becomes final, the Attorney General's discretion gives way to the INA's mandate that "the Attorney General *shall* record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for the adjustment of status is made." 8 U.S.C. § 1255(b) (emphasis added) (also providing that "the Secretary of State shall reduce by one the number of the preference visas authorized to be issued"); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 9–10 (2024) (observing, in the context of 8 U.S.C. § 1154(b), that language providing the agency "*shall* . . . approve the [spousal visa] petition" if certain criteria were met was a "mandatory determination[]" by Congress). This language stands in sharp contrast to other provisions of the INA in which Congress specifically gave the Attorney General discretion about whether to record adjustment to LPR status. *See* 8 U.S.C. § 1255b(b) ("[T]he Attorney General, *in his discretion*, *may* record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for adjustment of status is made." (emphasis added)); 8 U.S.C. § 1259 ("A record of lawful admission for permanent residence *may*, *in the discretion of the Attorney General and under such regulations as he may prescribe*, be made in the case of any alien, as of the date of the approval of

19

his application or, if entry occurred prior to July 1, 1924, as of the date of such entry . . . ." (emphasis added)).[7]  Plainly, Congress knew how to afford the Executive discretion when it intended to do so.  And "our caselaw distinguishes between actions which an agency official may freely decide to take or not to take, and those which he is obligated by law to take or not to take" with respect to adjustments of status.  *Pinho*, 432 F.3d at 203.

Although the recordation of an admission with LPR status is a ministerial task (one that helps track the number of LPRs admitted in a given year), the admission itself is a statutorily-defined event.  *Hanif v. Att'y Gen.*, 694 F.3d 479, 485 (3d Cir. 2012); 8 U.S.C. § 1101(a)(20).  It is also an event that has a significant legal effect.  It provides a noncitizen "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws."  8 U.S.C. § 1101(a)(20).  And, as discussed below, that status comes with a great measure of security.  *See Bamidele v. INS*, 99 F.3d 557, 564–65 (3d Cir. 1996); *Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 446 (3d Cir. 2016) ("[A] lawful permanent resident['s] . . . entitlement to broad constitutional protections is undisputed.").  That security includes clarity as to when the adjustment to LPR status becomes final, thereby concluding the period of the Attorney General's discretion.  Congress provided this clarity by mandating that the Attorney General record an adjustment to LPR status made under 8 U.S.C. § 1255(a) as of the date of the approval order.  8 U.S.C. § 1255(b).

---

[7] 8 U.S.C. §§ 1255b(b) and 1259 apply to certain classes of nonimmigrants, and these provisions are not at issue here.

20

Congress also provided clarity about when and why the Attorney General may pursue recission of an adjustment to LPR status. Even after the Attorney General no longer has discretion over the adjustment itself, Congress has provided the Attorney General a mechanism to rescind an adjustment to LPR status in limited circumstances. The Attorney General shall do so only when the person awarded adjustment to LPR status was "not in fact eligible for such adjustment of status" at the time of the adjustment. 8 U.S.C. § 1256(a).[8] And even

_____

[8] 8 U.S.C. § 1256(a) provides as follows:

> If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 1255 or 1259 of this title or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling removal in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section

when the Attorney General is satisfied of that person's ineligibility, the Attorney General may only seek to rescind LPR status "within five years after [the adjustment date]." *Id.*; *see also Bamidele*, 99 F.3d at 564–65 (requiring strict compliance with the five-year statutory limitation period for initiating recission of LPR status, even when LPR status was obtained by misconduct); *Garcia v. Att'y Gen.*, 553 F.3d 724, 726–28 (3d Cir. 2009) (confirming that *Bamidele* retains its precedential authority after the 1996 amendment to 8 U.S.C. § 1256(a)).

By providing the Attorney General with only a circumscribed ability to rescind an adjustment to LPR status, Congress recognized that an order approving an application for adjustment to LPR status under § 1255(a) is an event of legal significance. It results in "the alien's lawful admission for permanent residence" that goes into effect on a specific date: "the date the order of the Attorney General approving the application for the adjustment of status is made." 8 U.S.C. § 1255(b). And once that lawful admission goes into effect, the Attorney General's discretion ceases. *See id.* (mandating that the Attorney General record the adjustment to LPR status).

Applying this statutory and regulatory regime to this case, the time to appeal the IJ's April 2020 order adjusting Qatanani's status to LPR expired 30 days after the IJ issued that order. 8 C.F.R. § 1003.38(b). And while that appeal period might be flexible when it pertains to other decisions by immigration judges, *see* 8 C.F.R. § 1003.1(b) (listing the

---

1229a of this title, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.

22

decisions that are subject to the regulatory 30-day appeal period), the decision at issue granted an adjustment to LPR status. So it is governed by the provisions of the INA discussed above. And when 30 days elapsed without any party initiating an appeal, Qatanani's admission with LPR status became final by operation of law, effective as of April 27, 2020 (the date of the immigration judge's order). *See* 8 U.S.C. § 1255(b).

With this framework in mind, we turn to the task before us: assessing whether a BIA regulation can circumvent the statutory commands of Congress and the procedures therein.

B.

As a threshold matter, the government argues that we cannot reach Qatanani's challenge to the BIA's authority. It asserts that the challenge is barred because Qatanani failed to exhaust his administrative remedies before the BIA. *See* 8 U.S.C. § 1252(d)(1).

The government is incorrect. Exhaustion is required only when the BIA "was capable of granting the remedy sought by the [noncitizen]." *Barradas Jacome v. Att'y Gen.*, 39 F.4th 111, 120 (3d Cir. 2022) (citation omitted). Here, the BIA was incapable of granting Qatanani relief from 8 C.F.R. § 1003.1(c). On its face, the regulation imposes no time limit on the BIA's authority to self-certify a late appeal. And "[t]he [BIA] is bound to uphold agency regulations." *In Re Ponce De Leon-Ruiz*, 21 I. & N. Dec. 154, 158 (BIA 1996); *see also Matter of Anselmo*, 20 I. & N. Dec. 25, 30 (BIA 1989) ("A regulation promulgated by the Attorney General has the force and effect of law as to this Board and immigration judges, and

neither has any authority to consider challenges to regulations implemented by the Attorney General. . . .").

For similar reasons, we also recognize that the exhaustion of administrative remedies is not required where, as here, "the petitioner advances a due process claim" and shows he suffered prejudice from the "breach of the entitled protections."[9] *Hernandez Garmendia v. Att'y Gen.*, 28 F.4th 476, 485 (3d Cir. 2022) (quoting *Khan v. Att'y Gen.*, 448 F.3d 226, 236 n.8 (3d Cir. 2006)). This exception does not reach mere procedural errors that could have been corrected by the BIA. But the Board's lack of "jurisdiction to adjudicate constitutional issues" rendered it incapable of addressing the due process claim presented here. *Khan*, 448 F.3d at 236 n.8 (quoting *Bonhometre v. Gonzales*, 414 F.3d 442, 447 n.7 (3d Cir. 2005)). Just as the BIA had no authority to set aside a facially valid regulation for exceeding the statutory authorization of Congress, it also lacked jurisdiction to

---

[9] The dissent asserts that Qatanani "expressly declined to develop any such [due process] argument in this appeal," so it dismisses our analysis as dicta. Dissent at 13 n.20. But Qatanani argued that adherence to the "requisite recission procedures" may "be constitutionally required" by the Due Process Clause due to the "heightened procedural protections" afforded when an LPR's resident status is threatened. Opening Br. at 21 (quoting *Sharkey*, 541 F.3d at 92–93). And, at oral argument, his counsel argued that "due process goes to the interpretation of the statute . . . . [W]e're not saying the statute doesn't go far enough and so he needs more due process. We are saying the statute is in part there to protect these due process rights and that's one of the reasons it has to be strictly followed." OA Tr. at 11:23–12:5.

adjudicate whether its use comports with the constitutional minimums of due process. *Barradas Jacome*, 39 F.4th at 120 (requiring exhaustion only when "the . . . claim was within the jurisdiction of the [agency] to consider").

Qatanani had no obligation to present the BIA with a challenge it had no authority to consider.

1.

Rather than acknowledging the LPR status Qatanani attained 30 days after the IJ's April 2020 order, the BIA sought to undo the IJ's order in March 2021 by way of self-certification under 8 C.F.R. § 1003.1(c). In doing so, the BIA disregarded the import of the Congressional directive in 8 U.S.C. 1255(b) and attempted to end-run the LPR-rescission procedures Congress established in 8 U.S.C. § 1256(a). Its actions were unlawful.

The government argues that the BIA's behavior comported with the INA because the IJ's April 2020 order never became final. It relies on a regulation that states: "*Except when certified to the Board*, the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first." 8 C.F.R. § 1003.39 (emphasis added). According to the government, the BIA can self-certify an appeal of an immigration judge's decision at any time—even decades after the immigration judge makes his decision.

The implications of this argument are extraordinary. Under this reading of agency authority, the government has carte blanche to evade the limits Congress imposed on the

25

Executive's discretionary authority over adjustments to LPR status and to circumvent the procedures Congress mandated for recission of such adjustments. According to this view, by merely invoking two regulations (8 C.F.R. §§ 1003.39 and 1003.1(c)), the BIA could render a final adjudication to LPR status non-final, without the procedural protections that Congress provided. And it could do so at any time.

At oral argument, the government doubled down on that position. It asserted that, "whether it's lawful permanent resident status, [or] whether it's naturalization, the Government does retain the power to go back and revoke that status if certain conditions are met." OA Tr. 52:5–8. And although Congress has proscribed the time frame in which the Attorney General may rescind LPR status, the government submitted that "there [is] no requirement" to follow Congress's statutory command because an agency "regulation permits . . . the B[IA] with an unlimited time to go back and certify a decision that has come before it." OA Tr. 52:13–15.

When asked why "there would ever be a need to invoke [§] 1256(a) if the B[IA] has the unlimited discretion decades after an Immigration Judge's [o]rder to . . . revisit the decision that was made to adjust status," the government acknowledged that its position creates "an inherent tension between the regulation and the recission statute." OA Tr. 52:18–24. But this is no mere "tension." The government's position is antithetical to "the basic concept of separation of powers . . . that flow[s] from the scheme of a tripartite government." *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)). We therefore reject it.

26

In this as-applied challenge, we need not address the scope of the BIA's self- certification authority across the board. We need only address whether the BIA was authorized to self-certify an appeal in this case, where (1) the IJ's order adjusted Qatanani's status to LPR under 8 U.S.C. § 1255(a), and (2) the BIA sought to self-certify an appeal more than 30 days after the IJ's order. That action is inconsistent with the finality of an adjustment to LPR status under § 1255(a), as recognized by § 1255(b). When the time to appeal lapsed with no appeal filed, that marked the end of the Attorney General's discretion over Qatanani's adjustment of status in the first instance. The Attorney General was obligated by Congressional mandate to record Qatanani's adjustment to LPR status as of the date of the IJ's April 2020 order. 8 U.S.C. § 1255(b).

Of course, Congress provided the Attorney General another five years of authority to pursue recission of the adjustment if the Attorney General was satisfied that Qatanani was ineligible for the adjustment as of the date it took effect (that is, April 27, 2020). 8 U.S.C. § 1256(a).[10] But the

---

[10] Any disputes about recission proceedings for Qatanani are beyond the scope of this petition. We are unaware of whether the Attorney General initiated recission proceedings. However, because the government contended in a post-argument letter that the five-year period to do so had not yet expired (but was set to expire in late May 2025), we issued a Judgment in this matter just six days after oral argument. In that Judgment, we stated,

27

Attorney General was prohibited from otherwise disturbing the adjustment to LPR status. To hold otherwise "would undermine the security which ought to attend permanent resident status." *Bamidele*, 99 F.3d at 564 (cleaned up).

As we have long recognized, "[t]hat which is accomplished by a rescission of status is pretty harsh. It is comparable to the revocation of citizenship about which the courts have been very keen to make sure that the individual received careful protection." *Id.* (quoting *Quintana v. Holland*, 255 F.2d 161, 164 (3d Cir. 1958)); *see also id.* (noting that the rescission of LPR status "blocks the man on the road to citizenship, and results in banishment from a country where he may have lived a long time") (quoting *Quintana*, 255 F.2d at 164). Rescission of LPR status and revocation of naturalized citizenship require the Executive to follow the procedures

---

> [I]n the circumstances of this case, the Board exceeded its authority when it invoked 8 C.F.R. § 1003.1(c) and reversed the Immigration Judge's decision adjusting petitioner's status to that of a lawful permanent resident. *This conclusion is without prejudice to the Attorney General's exercise of authority to commence other proceedings under the Immigration and Nationality Act to the extent applicable.*

Judgment at 2, Dkt. No. 49, May 19, 2025 (emphasis added and footnote omitted). In a footnote, we explained that we issued the Judgment with an opinion to follow because we were "[m]indful that certain provisions of the INA impose a limitations period on the authority of the Attorney General to commence proceedings." *Id.* at 2 n.2.

28

Congress has put in place. *See id.* at 564–65; *Gorbach v. Reno*, 219 F.3d 1087, 1094 (9th Cir. 2000) ("[I]mplying authority for the Attorney General to take away people's citizenship administratively would gravely upset this carefully constructed legislative arrangement.").[11]

"To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Louisiana Pub.*

---

[11] According to the dissent, § 1256(a) limits only the Attorney General's authority to rescind an adjustment to LPR status based on ineligibility, and the Attorney General may continually reevaluate the discretionary aspect of an adjustment to LPR status. Dissent at 12–14. But Congress imposed a five-year limitation period on the Attorney General's ability to pursue recission of an adjustment to LPR status when a noncitizen never satisfied Congress's criteria for his adjustment to LPR status in the first instance. 8 U.S.C. § 1256(a). This limitation would be toothless if the Attorney General could exercise her discretion to rescind an adjustment to LPR status at any time. *See Bamidele v. INS*, 99 F.3d 557, 565 (3d Cir. 1996) ("[W]e cannot agree that Congress, presumably knowing that rescission usually places [a noncitizen] at immediate risk of deportation, would go to the trouble of enacting a statute of limitations on rescission actions, and then intend it to be construed so narrowly that it offered virtually no protection from untimely action by the [Attorney General].").

*Serv. Comm'n v. FCC*, 476 U.S. 355, 374–75 (1986).[12]  And, here, the BIA's actions went beyond the scope of the rescission procedures Congress authorized in the INA.  *See Sharkey v. Quarantillo*, 541 F.3d 75, 93 (2d Cir. 2008) ("We cannot accept the [agency]'s interpretation of the statute and the regulation, which would render them nullities.").  It acted unlawfully.

---

[12] Because no regulation can undermine a statute, we need not address deference to the BIA's interpretation of its regulations. We note, however, that we defer to an agency's interpretation of its regulation only when the regulation is genuinely ambiguous, the agency's interpretation is reasonable and implicates its substantive expertise, and does not create unfair surprise to regulated parties.  *Kisor v. Wilkie*, 588 U.S. 558, 575–77 (2019); *see also United States v. McIntosh*, 124 F.4th 199, 206 n.3 (3d Cir. 2024) (confirming that *Kisor* is undisturbed by the Supreme Court's decision eliminating *Chevron* deference).  No deference would be due to the BIA's interpretation of 8 C.F.R. § 1003.1(c) in Qatanani's case.  The BIA's interpretation is not reasonable for all the reasons discussed above.  It also creates unfair surprise to parties who rely on the permanence of an adjustment to LPR status under § 1255(a).  And the issue here—the interaction between (1) the 30-day period to appeal the IJ's order granting an adjustment to LPR status under § 1255(a) and (2) the terms of the INA— is a legal issue that implicates the expertise of the Judiciary, not the Executive.  *See Garcia v. Att'y Gen.*, 553 F.3d 724, 727 (3d Cir. 2009); *Bamidele*, 99 F.3d at 561; *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987).

2.

The BIA's purported authority to retroactively nullify Qatanani's adjustment to LPR status also runs afoul of the well-settled principles of finality and due process.

In administrative proceedings—and in immigration matters specifically—"the finality of an order cannot be conditioned on something that may never happen." *Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 184 (3d Cir. 2019) (citing *Pinho*, 432 F.3d at 193).[13] The BIA rarely self-certifies *any* late-filed appeal. *See Matter of Morales-Morales*, 28 I. & N. Dec. 714, 715 (BIA 2023) (describing the BIA's authority to self-certify a late-filed appeal under § 1003.1(c) as "a safety valve for exceptional circumstances.").[14] And we are unaware of any case other than

---

[13] *See also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 n.6 (1986) ("Where an administrative forum has the essential procedural characteristics of a court, . . . its determinations should be accorded the same finality that is accorded the judgment of a court. The importance of bringing a legal controversy to conclusion is generally no less when the tribunal is an administrative tribunal than when it is a court.") (alteration in original) (quoting Restatement (Second) of Judgments § 83, p. 269 (1982)).

[14] The government suggests that concerns about the BIA's purported authority to self-certify a late appeal of an order adjusting a noncitizen's status to that of an LPR are tempered by the requirement that the BIA use its authority only in "exceptional circumstances." *See Matter of Morales-Morales*,

31

Qatanani's in which the BIA has attempted to self-certify a late-filed DHS appeal of an order granting an adjustment to LPR status. We conclude that the finality of an immigration judge's order granting adjustment to LPR status under § 1225(a) cannot depend on whether the Executive self-certifies a late-filed appeal of that order—an event that may never happen. *See Jie Fang*, 935 F.3d at 184.[15] Instead, those orders become final by operation of law at a predictable and discernable time: when the 30-day period to appeal such an order lapses and no appeal has been taken.

Due process also requires that an order granting an application to adjust to LPR status have clear and predictable finality. It does not matter that adjustment to LPR status is itself discretionary.[16] Noncitizens who seek discretionary

---

28 I. & N. Dec. 714, 715 (BIA 2023); **OA Tr. at 43–45**. But that amorphous standard does not begin to cure the finality and due-process concerns addressed in this opinion. Further, the government offers little more than "its assurances that we can trust the BIA not to abuse its power." *Chehazeh*, 666 F.3d at 129. But "'trust us' is a poor operating principle for government." *Id*. at 130.

[15] We do not address the BIA's authority to self-certify late appeals of orders other than those granting adjustment to LPR status under § 1225(a).

[16] We need not reach the Attorney General's exercise of discretion because we conclude that the BIA lacked authority to hear a late appeal of the IJ's April 2020 order. *See Garcia*, 553 F.3d at 729 (distinguishing between a challenge to a

relief in immigration proceedings are guaranteed due process. *Calderon-Rosas v. Att'y Gen.*, 957 F.3d 378, 384 (3d Cir. 2020) (addressing the procedural due process rights of persons seeking asylum); *see Galvan*, 347 U.S. at 531 ("In the enforcement of [immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process.").

Moreover, a noncitizen is "accorded a generous and ascending scale of rights as he increases his identity with our society." *Osorio-Martinez*, 893 F.3d at 168 (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953)). An immigrant with LPR status has developed "substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). That makes him the "quintessential example of [a noncitizen] entitled to 'broad constitutional protections.'" *Osorio-Martinez*, 893 F.3d at 174 (quoting *Castro*, 835 F.3d at 447). That entitlement includes heightened procedural protections. *See Sharkey*, 541 F.3d at 86–87.

As discussed above, when 30 days elapsed without any party initiating an appeal from the IJ's April 2020 order,

---

discretionary decision to commence proceedings and "the government's very *authority* to commence those proceedings"). Qatanani is seeking "to enforce the result of an adjudication that has already taken place," *Chehazeh*, 666 F.3d at 137—the adjudication that conferred LPR status upon him.

Qatanani's admission with LPR status became final.[17] As a noncitizen with LPR status, he was entitled to heightened procedural protections. *See id.* Permitting the BIA to rescind his adjustment to LPR status outside of the process Congress provided would violate those due process protections. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1273 (3d Cir. 1987) (rejecting on procedural due process grounds an administrative appeal body's authority to review the grant of social security benefits after the appeal period expired). It would eliminate the security that attends LPR status, undermining Qatanani's ability to rely on his status to make decisions about home, family, community, and career in this country. *See Bamidele*, 99 F.3d at 564. And the purported authority of the BIA to self-certify late appeals of orders conferring LPR status would subject permanent residents to the "embarrassment, expense and ordeal . . . [of] liv[ing] in a continuing state of anxiety and insecurity." *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 137 (3d Cir. 2012) (citation omitted).

For all of these reasons, the BIA lacked authority to self-certify a late appeal in this case. It also lacked authority to issue an order of removal.[18]

---

[17] We do not "make [Qatanani] a lawful permanent resident." Dissent at 1. The IJ did that, acting as the delegate of the Attorney General. We grant Qatanani's request to "enforce the result of an adjudication that has already taken place," *Chehazeh*, 666 F.3d at 137, by providing his adjustment to LPR status the protection Congress commanded.

[18] The government argues that the IJ's April 2020 order never became final because Qatanani's medical exam, fingerprints,

34

## C.

We briefly express our grave concerns with the substance of the BIA's 2024 decision. At several points, the BIA ignored the IJ's factfinding (including credibility determinations), found facts for itself, substituted its view of the facts in place of the IJ's "permissible" view, and cherry-picked from the record (rather than meaningfully considering it as a whole), despite the clear instruction of our precedent and its own regulations. *See Alimbaev v. Att'y Gen.*, 872 F.3d 188, 195–200 (3d Cir. 2017); 8 C.F.R. § 1003.1(d)(3)(i), (iv). Moreover, the BIA penalized Qatanani for quintessential First Amendment activity. But we do not have occasion here to adjudicate the merits of those issues given an even more fundamental problem: The IJ's April 2020 order adjusting Qatanani's status became final when no timely appeal was filed, and the BIA lacked authority to hear DHS's late appeal of that order.

---

and background checks may have required updating, (notwithstanding that the IJ and counsel for DHS confirmed they were updated. At most, these issues go to whether the IJ *should* have adjusted Qatanani's status, not whether the IJ did so. The government also questions whether the Secretary of State allocated a visa number for Qatanani as required upon the grant of LPR status. *See* 8 U.S.C. § 1255(b). But whether the Secretary of State completed this ministerial task does not affect the adjustment of Qatanani's status. *See Hanif v. Att'y Gen.*, 694 F.3d 479, 485 (3d Cir. 2012).

\* \* \*

For the foregoing reasons, we granted Qatanani's petition for review and vacated the BIA's order of removal in our May 19, 2025, Judgment.

MATEY, *Circuit Judge*, dissenting.

For more than a quarter century, five Presidents and ten Attorneys General have objected to Mohammad Qatanani's presence in our Nation. After his three-year allowance ended in 1999, these Executives and their representatives determined, over and again, that Qatanani must leave. Yet today, this Court makes him a lawful permanent resident because we have lost the "respect for the functions of the other branches," *Webster v. Doe*, 486 U.S. 592, 609 (1988) (Scalia, J., dissenting), which was grounded in "a judicial attitude founded in law and hallowed by time" that "sees judicial review of agency action and executive action as sensitive business" deserving deference, Adrian Vermeule, *A Traditional Respect for the Functions of the Other Branche*s, The New Digest (Feb. 27, 2025). Our decision today forgets that humility and adds another impediment to the Executive's ability to carry out his duty to take care of immigration matters, a power that is both derived from congressional will and inherent in any sovereign.

Nearly thirty years ago, the same year Qatanani arrived for his "temporary" visit to the United States, Congress, in an action praised by then-President Clinton as a "landmark immigration reform" that "strengthens the rule of law by cracking down on illegal immigration at the border,"[1] acted to "'protec[t] the Executive's discretion' from undue interference

---

[1] William J. Clinton, *Statement on Signing the Omnibus Consolidated Appropriations Act, 1997* (Sept. 30, 1996), available at Gerhard Peters and John T. Woolley, The American Presidency Project, https://perma.cc/L47G-PSQQ.

by the courts."[2] I would respect that political judgment, mindful that "[n]o one, so far as my search of the several constitutional records uncovered, look[s] to the Court for 'leadership' in resolving problems that Congress, the President . . . failed to solve."[3] So with due regard for the political branches' control over immigration, I would dismiss Qatanani's petition.

## I.

Qatanani entered the United States in 1996 on a H-1B nonimmigrant visa with authorization to serve as an imam at The Islamic Center of Passaic Country (ICPC) until April 1, 1999. Rather than leave, he applied to adjust his status to lawful permanent residence (LPR). After almost two decades of

---

[2] *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 112 (2020) (alteration in original) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999)); *see Reno*, 525 U.S. at 486 ("Of course *many* provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation.").

[3] Raoul Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment 326 (2d ed. 1997).

administrative proceedings,[4] an Immigration Judge (IJ)[5] found Qatanani eligible for a status adjustment and deserving one as a matter of discretion. But the Board of Immigration Appeals

---

[4] DHS initiated removal proceedings in 2006, but the IJ did not reach a preliminary decision until 2008. The BIA reversed that decision in 2009, triggering nearly five more years of administrative review, another interim appeal and reversal by the BIA in 2014, followed by another three years of hearings before the IJ closed the evidentiary record in 2017. Not until three years later did the IJ grant Qatanani a status adjustment, a decision the BIA reversed in 2024. None can deny the Executive afforded Qatanani extensive, personalized process.

[5] As I have explained elsewhere, special inquiry officers were renamed "immigration judges" in the 1970s to confer "a more prestigious title." David A. Martin, Major Issues in Immigration Law 7 (Federal Judicial Center 1987); Immigration Judge, 38 Fed. Reg. 8590 (Apr. 4, 1973); *Pino-Porras v. Att'y Gen.*, No. 22-3419, 2025 WL 1752491, at *3 n.1 (3d Cir. June 25, 2025) (Matey, J., dissenting). This new title needlessly promoted the "judicialization" of IJs, Martin, *supra*, at 8, and brought understandable confusion as commentators, and citizens, understandably assume these employees exercise judicial, rather than executive power. But they hold no power under Article III, and are merely inferior officers of the United States, supervised by the Attorney General, and, in turn, the President, performing only "such duties as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4).

3

(BIA) disagreed, noting Qatanani's lack of candor,[6] admitted association with Hamas supporters, public call for a "new intifada," and failure to demonstrate yearly tax filings. A.R. 8. As I explain below, I would not disturb the BIA's decision.

## II.

Qatanani raises three main arguments. First, he claims the BIA could not review the IJ's decision under 8 C.F.R. § 1003.1(c). But as I explain in Part III, the BIA's authority to self-certify a case is not temporally limited. Second, Qatanani claims the BIA relied on facts not found by the IJ. That is either incorrect, or a harmless error, as I explain in Part IV. Third, Qatanani claims the BIA's decision violated the First Amendment by considering his call for a new intifada and associations with Hamas supporters. But as I explain in Part V, Qatanani is not a member of "the people" the First Amendment

---

[6] As the majority notes, Qatanani was detained and questioned by Israeli forces upon crossing into the West Bank from Jordan in 1993. From 1985 to 1991, Qatanani was an active member in the Muslim Brotherhood, which led to Israeli suspicion that Qatanani was a "member of the Islamic Resistance Movement; also known as HAMAS" because "HAMAS had been formed from the Muslim Brotherhood" in 1987. A.R. 7170, 7460–61. The same year Qatanani was detained by Israeli forces, Qatanani met with his now deceased brother-in-law, Sumaia Abu Hanoud, whom Qatanani himself described as the "military leader of HAMAS." A.R. 7171. Despite Qatanani's acknowledgment of Hanoud's leadership in Hamas, Qatanani's wife and her brothers have "denied the relationship between Mr. Hanoud and HAMAS when questioned by the U.S. authorities." A.R. 7172.

4

restricts government action against, nor is the denial of a status adjustment a punitive action that could ever ground a First Amendment claim. More broadly, Qatanani's arguments and the majority's reasoning deviate from the nature of our Nation's immigration laws, and the tradition they are founded on. So I begin by explaining the Executive's role over immigration.

Much of our present policy is governed by the Immigration and Nationality Act (INA). 66 Stat. 163, as amended 8 U.S.C. § 1101 *et seq.* But the ends enacted by Congress are informed by principles animating the INA[7] and "any policy toward aliens" is "intricately interwoven with contemporaneous policies in regard to the conduct of foreign

---

[7] Statutes are merely "a communal directive," Dig. 1.3.1 (Papinian, Definitions 1) (Alan Watson, trans., 1998), "the lawmaker's reasoned ordination for the common good" expressed in text, Adrian Vermeule, Common Good Constitutionalism 75 (2022). Since reasoned choices arise against, and from, the natural law, Vermeule, *supra*, at 80, we look to those principles to "ascertain the meaning and will of the lawmaking body," William M. Lile et al., Brief Making and the Use of Law Books 337 (3d ed. 1914) (quoted in Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 12 (2012)). Otherwise, we miss "grasping [statutes'] force and tendency." Dig. 1.3.17 (Celsus, Digest 26); *see also* Richard Ekins, The Nature of Legislative Intent 245 (2012) ("[T]he central point of interpreting . . . some legislature's lawmaking act [is] to understand what they have said and done, which means to identify the intentions on which they acted and which they aimed—meant—to make recognizable.").

relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). A sovereign's control over immigration is not a creation of our Constitution but is instead "an accepted maxim of international law," *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892), so I turn first to that universal understanding.

A sovereign may always "forbid the entrance of his territory either to foreigners in general or in particular cases, or to certain persons or for certain particular purposes."[8] As part of that duty, a sovereign has complete discretion to determine who it deems worthy to enter all parts of its political community.[9] Necessarily, there is no obligation to accept all

---

[8] Emmerich de Vattel, The Laws of Nations § 94, at 169–70 (Philadelphia, Joseph Chitty ed., R. & J. W. Johnson 1852) (1758); *see also* 1 Robert Phillimore, Commentaries Upon International Law 320 (London, Butterworths 3d ed. 1879) ("[T]he Government of a State may prohibit the entrance of strangers into the country . . . ."); Samuel Pufendorf, Of the Law of Nature and Nations c. 3, § 9, at 245–46 (London, Basil Kennett trans., 4th ed. 1729) (explaining sovereigns may grant "[l]icence to Foreigners to come and settle amongst them").

[9] Vattel explained a sovereign can admit and expel a foreigner from the land "as he may think it advantageous to the state." Vattel, *supra*, at 170. As Phillimore put it, a sovereign "regulate[s] the conditions under which [foreigners] shall be allowed to remain in [the territory[], or may require and compel their departure from it." Phillimore, *supra*, at 320. This discretion to extend foreigners the privilege to be within a sovereign's domain was only exercised favorably if a foreigner "submit[s] to the establish'd Government, and behave[s]

6

aliens under all circumstances.[10] The English tradition mirrored this understanding of sovereign discretion, granting the King sole administrative power. *See* 1 William Blackstone, Commentaries \*259–60 (explaining that "strangers" to the nation are "liable to be sent home whenever the king sees occasion").[11] The American practice followed England's lead, vesting immigration choices in the political branches. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature.").[12]

themselves with such Prudence and Decency, as to administer no occasion to Factions and Seditions" or "endanger the Natives." Pufendorf, *supra*, at §§ 9–10, 245–46.

[10] Pufendorf, *supra*, at § 10, 246 (explaining that "[h]umanity" does not counsel a sovereign to accept a foreigner who was "expell'd their Home" "for their own Demerit and Crime").

[11] *See also* John Locke, Second Treatise of Civil Government §§ 146–47, at 73 (J.W. Gough ed., Basil Blackwell 1948) (1690) (noting the power to act toward "foreigners, depending much upon their actions, and the variation of designs and interests, must be left in great part to the prudence" of the executive "who ha[s] this power committed to them, to be managed by the best of their skill, for the advantage of the commonwealth").

[12] *See also Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) ("The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, [is] an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare . . . ."); *Ping v. United States*, 130 U.S. 581, 603–04 (1889) ("Jurisdiction over its own

Because a sovereign holds the duty to control who may enter its borders, an alien's license to remain within our Nation is always "a matter of grace, not right." *Elkins v. Moreno*, 435 U.S. 647, 667 (1978); *see also Ameeriar v. Immigr. & Naturalization Serv.*, 438 F.2d 1028, 1030 (3d Cir. 1971) (en banc) ("Adjustment of status is . . . a matter of administrative grace, not mere statutory eligibility."). That is because "[a]dmission of aliens to the United States is a privilege granted by the sovereign United States Government . . . only upon such terms as the United States shall prescribe." *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also Landon*, 459 U.S. at 32 ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

The Sovereign's duty to police its borders imposes a continuous prerogative, one Congress codified in the INA. The design of the INA embraces Executive reassessment of aliens, confirming constant oversight and corresponding authority to conclude that the grace by which an alien was permitted to

territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens it would be to that extent subject to the control of another power."); *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.").

enter and remain in our Nation is no longer due. Executive immigration decisions, unlike judicial judgments, necessarily fluctuate and so do not possess the finality associated with ordinary civil or criminal cases.[13] That is true even if an alien naturalizes.[14] All meaning that no judicial-like finality

---

[13] For example, the Attorney General is not constrained in ordering "any person not a citizen or national of the United States," 8 U.S.C. § 1101(a)(3), removed if—regardless of status—the alien "has engaged in a terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i)(I), or "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization," § 1182(a)(3)(B)(i)(VII). *See* 8 U.S.C. § 1227(a)(4)(B) ("Any alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title is deportable.").

[14] If an alien became a naturalized citizen "upon the basis of a record of a lawful admission for permanent residence" that was "created as a result of an adjustment of status for which such person was in fact not eligible," his LPR status may be rescinded and his naturalization may be revoked. 8 U.S.C. § 1256(b). Naturalization can also be revoked on other grounds under 8 U.S.C. § 1451, including when a naturalized person "become[s] a member of or affiliated with any organization . . . with which at the time of naturalization would have precluded such person from naturalization." § 1451(c). That action is "considered prima facia evidence that such person was not attached to the principles of the Constitution of the United States and was not well disposed to the good order and happiness of the United States at the time of naturalization." § 1451(c). And the Attorney General has the power to "correct, reopen, alter, modify, or vacate an order naturalizing the person." § 1451(h).

descends upon immigration decisions, including discretionary status adjustment determinations. And that is where the majority and I part: due regard for the political questions inherent in immigration leaves no room for judicial policing over policy.[15]

---

[15] By "political questions" I refer not to modern tests from caselaw, but the original principle that discretionary judgments assigned to, or arising in, the political process cannot involve the judicial power over cases and controversies. Many have rightly criticized the reimagining of this limitation in *Baker v. Carr*, 369 U.S. 186 (1962), as doubly deceitful. *Baker* stingily cabins the deference owed to the political branches while expanding judicial review all under the guise of restraint. But "[t]he distinction in constitutional law between political and legal questions has been with us from the beginning." Robert F. Nagel, *Political Law, Legalistic Politics*: *A Recent History of the Political Question Doctrine*, 56 Chi. L. Rev. 643, 644 (1989). Unfortunately, adherence to that "old fashioned" principle changed with *Baker*, which through the "the lens of modern functionalism" limited the scope of the political question doctrine by replacing "observation" and "rationalization" with "functional analysis" to "expand[] the judiciary's role." *Id.* at 644–46. Such perversion of long-standing principle, "extend[ed] the judicial function beyond its bounds," resulting in "a pedantic and academic treatment of the texts of the constitution and laws," far removed from "ordinary and humble judicial duty." James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129, 138 (1893).

Instead, courts should observe the firmer, older view that "[i]n the case of purely political acts and of the exercise of mere discretion, it mattered not that other departments were

## III.

The majority contends LPR status became final when DHS's appeal window expired, an argument Qatanani failed to exhaust, and a conclusion that conflicts with the BIA's codified authority.

---

violating the constitution, the judiciary could not interfere; on the contrary, they must accept and enforce their acts." *Id.* at 134–35; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170–71 (1803); *Decatur v. Paulding*, 39 U.S. (14 Pet.) 497, 515 (1840). It is not balancing factors that make the Attorney General's discretion unreviewable, but the nature of immigration decisions inherent in Sovereignty. *See* Oliver P. Field, *The Doctrine of Political Questions in the Federal Courts*, 8 Minn. L. Rev. 485, 492–94 (1924); *Lem Moon Sing v. United States*, 158 U.S. 538, 548 (1895) (whether an alien may remain is "a matter wholly political in its character," that must be made "exclusively and finally, in every instance, by executive officers charged by an act of congress with the duty of executing the will of the political department of the government"). Fear that such power by the political branches "may be abused" provides no justification for departing from this longstanding principle. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 32 (1827). The remedy for abuse "as well as for all other official misconduct" "is to be found in the constitution itself. In a free government, the danger must be remote, since in addition to the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny." *Id.*

11

**A.**

Start with exhaustion, as we "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available." 8 U.S.C. § 1252(d). Qatanani has not. He never argued before the BIA that his LPR status was final and could not be rescinded absent compliance with 8 U.S.C. § 1256(a) (rescission of status adjustment) or 8 U.S.C. §§ 1229 and 1229a (commencement of new removal proceedings). The Attorney General noted Qatanani's failure to comply with section 1252(d)(1), so "we 'must enforce the rule,'" *Aguilar v. Att'y Gen.*, 107 F.4th 164, 169 (3d Cir. 2024) (quoting *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 549 (2019)).

Qatanani tries to justify his noncompliance by repackaging his claims as a facial challenge to the "validity of the BIA's certification regulation." Opening Br. 26. He reasons that because the BIA lacks authority to consider challenges to its own regulations, exhaustion was unnecessary. Not so. Although the BIA will not review challenges to the validity or constitutionality of its own regulations, *Matter of Anselmo*, 20 I. & N. Dec. 25, 30 (BIA 1989), it can consider challenges to its own application of a regulation in specific circumstances. Thus, his "claim was within the jurisdiction of the BIA to consider," and the BIA "was capable of granting the remedy sought by the alien," so it is subject to administrative exhaustion. *Bonhometre v. Gonzales*, 414 F.3d 442, 447 (3d Cir. 2005).

Following our usual practice of requiring a petitioner "make[] some effort . . . to place the Board on notice" of the issue, *Nkomo v. Att'y Gen.*, 986 F.3d 268, 272 (3d Cir. 2021),

12

makes much sense here. If Qatanani had advised the BIA of his construction of section 1003.1(c) and offered his arguments about the burdens and hardships of using that authority in his case—points he argued on appeal for the first time—the BIA might well have agreed. That would have obviated our wading into a host of novel questions without any chance for administrative input. Reaching to resolve niche questions about obscure procedural practices presents the sort of risks, inefficiencies, and intrusions into the Executive that animate the statutory exhaustion requirement. I would apply that sound limitation here.

**B.**

On the merits, the IJ's decision did not result in a final status adjustment because the BIA self-certified Qatanani's case for review. That decision was proper because 1) there is no temporal limit on the BIA's certification authority, and 2) the certification regulation does not conflict with the statutory scheme for rescinding LPR status.

**1.**

Ordinarily, "the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first." 8 C.F.R. § 1003.39. Any notice of appeal "shall be filed . . . within 30 calendar days after the stating of an immigration judge's oral decision or the mailing or electronic notification of an immigration judge's written decision." 8 C.F.R. § 1003.38(b). Typically, then, an IJ's decision would be treated as final within thirty calendar days absent appeal. § 1003.38. But section 1003.39 explains "the decision of the

13

Immigration Judge becomes final" "[e]xcept when certified to the Board." That carveout controls this case. The majority disagrees and cabins the BIA's ability to certify a case to the thirty-day window for appeal, imposing a limitation absent from regulation and statute.

Certification is a compliment to the appeals process, one that allows the Attorney General to discharge the Executive's duty to oversee immigration decisions. Embodying the responsibility to ensure consistent and suitable judgments within the Executive branch, the BIA's certification power extends to any case over which it has appellate jurisdiction, including decisions of an IJ in removal proceedings[16] or on an application for adjustment of status.[17] § 1003.1(c).

A case can be certified to the BIA by an IJ, DHS, or the BIA itself. *Id.* Requests by an IJ or DHS are limited to the timeframe "after an initial decision has been made and before an appeal has been taken." 8 C.F.R. § 1003.7. That means certifications sought by an IJ or DHS must occur inside the thirty-day appeal window.[18] But no similar temporal limitation is placed on the BIA's certification authority. Instead, "[t]he Board, in its discretion, may review any such case by certification without regard to" the temporal limits placed on an IJ or DHS officer under section 1003.7 if "the parties have already been given a fair opportunity to make representations

---

[16] *See* § 1003.1(b)(3).

[17] *See* § 1003.1(b)(12).

[18] *See* § 1003.38(b) (requiring any notice of appeal of an IJ's decision to be filed "within 30 calendar days after the stating of an [IJ's] oral decision or the mailing or electronic notification of an [IJ's] written decision").

14

before the Board regarding the case, including the opportunity to request oral argument and to submit a brief." § 1003.1(c). So to give meaning to "every word and every provision" in both sections 1003.1(c) and 1003.7, the BIA's certification authority cannot be limited to the thirty-day appeal window. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (citing Dig. 2.7.5.2 (Ulpian, Edict 5) ("Words are to be taken as having an effect.")). The absence of a temporal restriction on the BIA's authority to self-certify a case is not a defect, evidenced by a parallel regulation giving the BIA power to review its own prior decisions sua sponte and without a temporal restriction, *see* 8 C.F.R. § 1003.2(a), one we have recognized, *see Park v. Att'y Gen.*, 846 F.3d 645, 647–48 (3d Cir. 2017). As a result, the BIA's discretion to revisit both an IJ's decision and its own decisions "is broad—so broad, in fact, that we have no meaningful way to review it, thereby depriving us of jurisdiction." *Park*, 846 F.3d at 648. In sum, an IJ's decision can be reviewed whenever the BIA self-certifies the case.

**2.**

The majority does not disagree with the ordinary reading of section 1003.1(c); rather, it sees irreconcilable tension with statutory authority over ministerial acts accompanying status adjustments and the recission of LPR status. But none exists.

First, there is no conflict between the BIA's authority to self-certify a case under section 1003.1(c) and recission of status under section 1256(a). Status adjustments involve a two-step inquiry. 8 U.S.C. § 1255(a). First, the alien must prove he is "eligible" by demonstrating the "threshold

15

requirements established by Congress." *Patel v. Garland*, 596 U.S. 328, 332 (2022); *see also* §§ 1255(a), 1182. Second, the alien must also persuade the Executive that "he merits a favorable exercise of discretion." *Patel*, 596 U.S. at 332. Section 1256(a) concerns solely the first step, and the Attorney General may rescind a status adjustment only if the alien was *ineligible* for a status adjustment within five years of the adjustment.[19] But section 1256(a) says nothing about the discretionary judgment of the Attorney General's analysis. Thus, while the statutory scheme Congress created for rescinding LPR status is cabined to eligibility determinations, the BIA's certification authority permits the Executive to review the discretionary determination whether an alien's presence remains preferable. Properly framed, the purported problems among sections 1003.1(c) and 1256(a) fall away as they each relate to a different part of the status adjustment analysis.

Second, the administrative acts that follow a status adjustment pose no conflict with the BIA's ongoing certification authority. As the majority explains, the Attorney General must record a status adjustment "as of the date [of] the order," while the "Secretary of State shall reduce by one the number of the preference visas authorized to be issued." § 1255(b). Both are mere ministerial acts to track the ebb and flow of aliens in our Nation. But they say nothing about the status conferred to the alien and its duration. Nor do these

---

[19] *See* § 1256(a) (permitting the Attorney General to rescind LPR status if it "appear[s] to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status" and treat the alien "to the same extent as if the adjustment of status had not been made").

record keeping requirements in any way cabin future Executive action to reconsider earlier assessments. Such secretarial systems are silent as to the substance of the Executive's authority to evaluate the suitability of status adjustments.

Distilled down, the majority's view that section 1003.1(c) conflicts with the statutory scheme for rescinding LPR status is grounded in the view that, at some point, immigration decisions must become final, permanent, and unchangeable. But as explained in Part II, immigration is a tiered process through which the Executive exercises authority under the INA and its inherent power to continually reevaluate an alien's request to remain within our Nation. And as licenses to remain are always a matter of administrative grace, nothing unexpected, much less unfair, follows from fresh Executive review through perpetual certification authority.[20]

---

[20] The majority invokes notions of due process to ground its view that status adjustments are final. That is unwarranted as Qatanani never raised a due process claim before the BIA and has expressly declined to develop any such argument in this appeal, making the observations dicta. And any discussion of that notoriously vague phrase requires precision. The Fifth Amendment does not create an individual right, but instead serves as a restriction on government, "secur[ing] the individual from the arbitrary exercise of the powers of government." *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819); *see also Hurtado v. California*, 110 U.S. 516, 527 (1884). There are no freestanding substantive rights to oppose all government action, only a commitment to a set of procedures that, if established, government must follow before acting against an individual's life, liberty, or property. *See* Nathan S. Chapman, *Due Process*

17

The BIA did not err in self-certifying the IJ's decision for review because no restriction temporally limits its certification authority. And because certification occurred, the IJ's decision granting Qatanani a status adjustment was subject to review and revision.

## IV.

I consider next the BIA's conclusion that Qatanani did not warrant a status adjustment as a matter of discretion based on four adverse factors: 1) his lack of candor in disclosing his detention in Israel, 2) his failure to submit proof that he

---

*Abroad*, 112 Nw. U. L. Rev. 377, 441 (2017) ("The original understanding of due process guaranteed that courts would enforce constitutional and statutory limits on governmental deprivations of 'life, liberty, or property.'").

With that proper framing in mind, the majority's due process discussion makes two errors. First, the majority assumes the conversion of status to LPR, the very issue on appeal before the BIA. Second, even accepting Qatanani maintained LPR status at the time of the BIA appeal, no process was skipped. An alien with LPR status must receive "a fair hearing." *Landon*, 459 U.S. at 32. And when certifying a case for review beyond the thirty-day appeal window, the BIA must provide the parties an "opportunity to make representations before the Board regarding the case, including the opportunity to request oral argument and to submit a brief," § 1003.1(c), which occurred here. So the BIA gave Qatanani all the process he was owed on appeal. Not to mention the twenty-five years of extensive process the Executive has afforded Qatanani since 1999, the sole reason he remains present.

18

consistently filed taxes, 3) his public call for a new intifada, and 4) his admitted associations with supporters of the terrorist organization Hamas. Qatanani says the BIA's reasoning hinged on impermissible factual findings. I disagree. And I note the narrow margin of my review, mindful that Congress asks the Executive, not the courts, to decide questions about status adjustments. § 1255(a). With due regard for the Executive's authority over such political questions, Congress stripped our jurisdiction to second guess the Executive's status adjustment determinations and the necessarily fact-sensitive issues that accompany those decisions, 8 U.S.C. § 1252(a)(2)(B)(ii), leaving us to review only "whether the agency made an error of law," *Cortez-Amador v. Att'y Gen.*, 66 F.4th 429, 434 (3d Cir. 2023); *see* § 1252(a)(2)(D). Here, none occurred.

**A.**

Qatanani contends the BIA misconstrued facts found by the IJ regarding his lack of candor and failure to file tax returns. The BIA is prohibited from "engag[ing] in de novo review of findings of fact determined by an [IJ]." § 1003.1(d)(3)(i). So if the BIA's "characterization of the record appears inaccurate and reflects a decision to 'ignor[e]' evidence crucial to [the] case" or reweigh testimony, *Alimbaev v. Att'y Gen.*, 872 F.3d 188, 200 (3d Cir. 2017) (quoting *Kabba v. Mukasey*, 530 F.3d 1239, 1247 (10th Cir. 2008)), then the BIA has exceeded its authority. Here, at most, the BIA repeated findings made by the IJ or looked to facts undisputed in the record, neither of which amounts to fresh findings.

19

**1.**

In reaching its conclusion that Qatanani's "lack of candor on his application for adjustment of status" counseled against a status adjustment, the BIA relied on the facts noted by the IJ. A.R. 7. The BIA pointed to Qatanani's failure to disclose "his detention in the West Bank" on his adjustment application. A.R. 7. And based on Qatanani's educational and professional accomplishments, *see* Majority Op. at 4, and his assistance of counsel in submitting his adjustment application—all facts the IJ noted—the BIA concluded his failure to disclose his detention, even if not a willful material misrepresentation, still reflected a lack of candor. The same conclusion drawn by the IJ about Qatanani's lack of candor based on the same facts the BIA noted. Regardless of whether the BIA quoted the IJ's words directly or rephrased them, it did not substitute findings or discover new facts beyond the record.

**2.**

The same conclusion applies to the BIA's determination that Qatanani failed to "present[] sufficient evidence of having filed tax returns for the years 2011-2016," A.R. 10, facts apparent from the record. The BIA did not suggest, let alone find, that Qatanani failed to file his taxes, it merely noted Qatanani omitted those filings.[21] Pared down, Qatanani's

---

[21] While the IJ stated that Qatanani "has consistently paid his taxes," A.R. 437, even Qatanani concedes the record contains no evidence of returns from 2011 to 2016. Whatever the IJ meant by "consistently," his statement cannot be construed as a finding that Qatanani filed taxes from 2011 to 2016.

20

argument amounts to mere disagreement with the BIA, but we lack jurisdiction to review the BIA's discretionary decision to treat certain facts as adverse. *See Zheng v. Gonzales*, 422 F.3d 98, 111 (3d Cir. 2005) ("[Section 1252(a)(2)(B)(i)] plainly forecloses review of the Attorney General's exercise of discretion in granting adjustment of status in individual cases . . . .").

**B.**

Next, Qatanani quarrels with the BIA's review of his speech in Times Square. Let us first set the stage. Qatanani was a featured speaker at rally in Times Square protesting the President's decision to recognize Jerusalem as the capital of Israel, and to relocate the United States embassy from Tel Aviv to Jerusalem. As a lead speaker, Qatanani urged the crowd: "No peace process and negotiation without liberation in Palestine. [Oslo] has to be stopped and finished. We have to start a new intifada. Intifada, intifada!" A.R. 1410, 1575. Qatanani then led the attendees in a call and response exchange of "Intifada, Intifada!" A.R. 1410. Qatanani again extolled the crowd that "The time now is different! It is not nineteen ninety-five," to which the crowd responded, "With our soul, with our blood, we will sacrifice [these] for you, Al-Aqsa." A.R. 1410.[22]

---

[22] Around the same time as Qatanani's speech, Hamas released statements similarly denouncing peace and calling for a new intifada. At the time DHS moved to enter his speech into the evidentiary record, those calls had led to multiple outbreaks of violence, resulting in "deaths and hundreds of injuries." A.R. 1575. Unfortunately, the "incessant calls" to "globalize the intifada" continue on today, and tragically have only "soften[ed] the ground for future attacks against Jews." Lee P.

21

None challenge the accuracy of this account.[23] The IJ said intifada means "rebellion" or "uprising," but declined to say whether it called for violence. A.R. 437–38. The BIA affirmed that view, noting "intifada" means "an armed uprising against another sovereign nation." A.R. 9. In my view, neither exercise in reading amounts to a factual finding about Qatanani's intent. But even assuming they are, the BIA properly applied clear-error review.

This is a narrow disagreement about a dictionary entry. The IJ looked to Merriam-Webster, but despite the clear definition of "intifada" as an "uprising" or "rebellion," could not "decipher what [Qatanani's] 'new intifada' would entail." A.R. 438. Then, based on nothing more, the IJ decided Qatanani's speech was a "peaceful demonstration." A.R. 438. The IJ made no credibility determination and resolved no disputed facts. He just looked up a word, incorrectly it turns out.[24] The BIA did the same but read the whole entry, which included "an armed uprising of Palestinians against Israeli occupation." A.R. 9.[25] If it was permissible for the IJ to look

Rudofsky, et al., *Make Sarah and Yaron's Memory a Blessing*, The Dispatch (May 28, 2025), https://perma.cc/4BY7-469A.

[23] To view Qatanani's full remarks, see *Times Square Rally Opposing Jerusalem as Capital of Israel*, Youtube at 17:66–20:36 (Dec. 8, 2017), https://perma.cc/J6KM-ASB5.

[24] It appears the IJ quoted the synonyms provided for "intifada," not the definition. *See Intifada*, Merriam-Webster, https://perma.cc/78F4-V6G9 (last visited Apr. 23, 2025).

[25] Of course, "the word intifada is no mystery: It's a reference to armed violence—harkening back to the Palestinian terrorism of the First and Second Intifadas in Israel." Rudofsky, *supra*.

up a word, then it is permissible for the BIA to read the full definition.

But even if buried somewhere in the IJ's synonym pursual is a factual finding, the BIA correctly applied the clear-error standard in reversing. True, the BIA cannot "engage in de novo review of findings of fact determined by an [IJ]." § 1003.1(d)(3)(i). But the BIA may review factual findings "to determine whether the findings of the [IJ] are clearly erroneous," § 1003.1(d)(3)(i), so long as it "identifies specific reasons for forming a definite and firm conviction that a mistake has been made," *Alimbaev*, 872 F.3d at 196 (citation and quotation omitted). The BIA did just that, providing specific explanations for how the IJ erred in finding "intifada" does not denote at least some sort of violence given its definition as "an armed uprising." A.R. 9. The BIA ignored no contrary evidence, acknowledged the parties' differing positions, and did not disturb the IJ's credibility conclusions. *See Alimbaev*, 872 F.3d at 197. If clear-error analysis applies, the IJ was clearly incorrect.

## C.

The BIA also considered Qatanani's "admitted connections to people who have fundraised for Hamas" to counsel against a status adjustment. A.R. 8. That conclusion is not impugned with reliance on impermissibly found facts. Even if it were, such error is harmless.

First, the BIA merely pointed to Qatanani's own admissions about his connections to people he acknowledged

23

raised funds for Hamas.[26] Nothing prohibits the BIA from considering uncontested facts, even those the IJ did not mention.[27] That is because when the IJ credits the petitioner's testimony, as the IJ did here, "a reviewing court is as competent as an immigration judge to draw logical inferences from those facts." *Jishiashvili v. Att'y Gen.*, 402 F.3d 386, 398 (3d Cir. 2005) (Aldisert, J., concurring). Otherwise, the BIA would be limited to considering only the parts of the record an IJ cited in rendering a decision.

But even construing the BIA's analysis as error, it was harmless. We have repeatedly explained harmless error is not enough to disturb the Executive's immigration decisions.[28] An error is "harmless" "when it is highly probable that the error did not affect the outcome of the case." *Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011). A sensible limitation, since "[t]he pursuit of perfection is particularly unwise in the immigration

---

[26] The BIA cited the transcript of Qatanani's testimony before the IJ on June 2, 2008, that 1) Qatanani donated money to the Holy Land Foundation before it was shut down in 2001 for providing material support to Hamas; 2) the ICPC, where he serves as imam, donated money to the Holy Land Foundation and held fundraisers for it; and 3) the second imam at ICPC Qatanani worked with was prosecuted for fundraising for Hamas.

[27] *See Wallace v. Gonzales*, 463 F.3d 135, 141 (2d Cir. 2006) (per curiam); *Chen v. Holder*, 703 F.3d 17, 23 (1st Cir. 2012).

[28] *See, e.g.*, *Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011); *Chavez-Chilel v. Att'y Gen.*, 20 F.4th 138, 144 (3d Cir. 2021); *Galeas Figueroa v. Att'y Gen.*, 998 F.3d 77, 86 n.5 (3d Cir. 2021).

context," where "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). That is the case here because any error about Qatanani's donations was harmless considering Qatanani's other admitted associations to Hamas supporters.

## V.

Finally, I explain why the BIA's review of Qatanani's Times Square speech and admitted associations with Hamas supporters does not violate the First Amendment. Of course, an alien's speech can offer important insight into his character that informs the Executive's determination about whether the alien's presence will add to the common good. None disagree with that observation, nor does the First Amendment because Qatanani is not part of "the people" the First Amendment protects, nor is the denial of LPR status a punitive action.

## A.

Under the First Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I. This guarantee cannot be invoked by aliens excluded from our borders because an alien "does not become one of the people to whom" the First Amendment applies "by an attempt to enter, forbidden by law." *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904). That is because "[t]o

25

appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist, those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise." *Id.* So there is no debate that excluded aliens cannot invoke the First Amendment.[29]

Whether the First Amendment restrains government action against all aliens within our Nation's borders is less explored. Begin with *Bridges v. California*, involving state contempt charges against a group including a resident alien lawfully within the country for at least two decades. 314 U.S. 252 (1941); *Bridges v. Wixon*, 326 U.S. 135, 137 (1945). With little analysis, the Court concluded the contempt charge was impermissible under the First Amendment. *Bridges,* 314 U.S. at 270–78. But the Court did not mention, let alone analyze, Bridges's alien status. A few years later, the Court considered whether Bridges, still a lawful resident alien, was removable under 8 U.S.C. § 137(f) for affiliation with the Communist Party. *Wixon*, 326 U.S. at 141. The majority saw insufficient

---

[29] Aliens on the threshold of initial entry are treated as excluded. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). So too are aliens who unlawfully step foot within our borders but are shortly stopped before developing substantial connections with our Nation akin to permanent residence. *United States v. Ju Toy*, 198 U.S. 253, 263 (1905). And aliens paroled into the country are also seen as excluded because they are treated as if stopped at the border while administrative proceedings ensue. *Thuraissigiam*, 591 U.S. at 139; *see also Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958).

26

evidence of his alleged membership but, in dicta, wrote that "[f]reedom of speech and press is accorded aliens residing in this country," citing only the earlier decision in *Bridges v. California*. *Id.* at 148. Concurring, Justice Murphy wrote that the statute was unconstitutional and that all aliens lawfully within our borders receive "the immutable freedoms guaranteed by the Bill of Rights," including freedom of speech. *Id.* at 160 (Murphy, J., concurring); *see id.* at 161–62. But Chief Justice Stone and Justices Roberts and Frankfurter found no fault with the statute based on Congress's "plenary power over the deportation of aliens." *Id.* at 167 (Stone, C.J., dissenting). So *Wixon* does not resolve whether the First Amendment applies to all resident aliens, much less unauthorized aliens.[30] At most, its dicta suggests that lawful

---

[30] Little has been clarified since *Wixon*. The Court has continued to acknowledge lawful resident aliens receive First Amendment protections, but it has never held the First Amendment restrains government action against aliens with less protective status. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Some decisions correctly understand *Wixon* to address no more than LPRs. *See, e.g.*, *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001). But others read *Wixon* with less nuance and assume any alien within the country holds First Amendment guarantees, regardless of whether the alien is an LPR, only has temporary authorization to be in the country, or is here illegally. *See, e.g.*, *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1109 n.23 (9th Cir. 2001); *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 365 (9th Cir. 1995); *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995).

resident aliens, what we today could call LPRs, can potentially invoke the First Amendment in some criminal prosecutions.

Our Nation's longstanding practice also yields few insights, as there is no unbroken chain of understanding or "regular course of practice" that might "liquidate & settle the meaning" of the First Amendment's applicability to aliens. Letter to S. Roane (Sept. 2, 1819), *in* 8 The Writings of James Madison 450 (1908); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 35–36 (2022). Nor is there any evidence of "a governmental practice [that] has been open, widespread, and unchallenged since the early days of the Republic," that might "guide our interpretation." *Nat'l Lab. Rel. Bd. v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment). All to say, there is no long standing post-enactment practice—custom, we might properly call it—recognizing all aliens within our borders possess First Amendment rights.

**B.**

But lack of precedent and practice does not mean an absence of answer derived from "the natural principles that support our legal tradition," *Range v. Att'y Gen.*, 124 F.4th 218, 234–35 (3d Cir. 2024) (Matey, J., concurring), which are the "certain 'primary truths, or first principles, upon which all subsequent reasoning must depend,'" *id.* at 234–35 (quoting The Federalist No. 31, at 193 (Alexander Hamilton) (C. Rossiter ed., 1961)).

We know that many aliens within our borders do not enjoy constitutional protections against state action. Much like the Preamble and the Second, Fourth, Ninth, and Tenth Amendments, the First Amendment uses the term "the

28

people,"[31] referring "to a class of persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *see Dist. of Columbia. v. Heller*, 554 U.S. 570, 580 (2008) (noting "provisions of the Constitution that mention 'the people,'" "refer[] to all members of the political community"). Only as an alien "increases his identity with our society" do the "generous and ascending scale of rights" spring into action, *Verdugo-Urquidez*, 494 U.S. at 269 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)), some of which include the "constitutional provisions [that] extend beyond the citizenry," *id.* at 269. But neither "lawful but involuntary" entry, nor mere physical entry without "significant voluntary connection[s]," suffice for an alien to become part of "the people." *Id.* at 271.

This distinction makes sense, as it has long been accepted that a sovereign's laws, including restrictions and

---

[31] The use of "the people" elsewhere in the Constitution aligns with the political class. *See* U.S. Const. art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."); *id.* amend. XVII ("The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. . . . Provided, [t]hat the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.").

privileges, extend only to "persons and things within its own territory according to its own sovereign will and public policy." Joseph Story, Commentaries on the Conflict of Laws, Foreign and Domestic § 22 (Boston, Hilliard, Gray, and Company 1834). This understanding was viewed as "inherent in nature, for it was derived from an underlying assumption about the essential purpose of government, protection, which in turn was derived from ideas about the equal freedom of human beings in the state of nature." Phillip Hamburger, *Beyond Protection*, 109 Colum. L. Rev. 1823, 1840 (2009). Thus, "an individual ha[s] a right to the protection of government and its laws only by virtue of his allegiance." *Id.* at 1838.

Eighteenth-century thinkers recognized this principle as following the nature of things, making protectionism "a truism of the common law." *Id.* "[F]ounded in reason and the nature of government," "[a]llegiance is the tie, or *ligamen*, which binds the subject to the king, in return for that protection which the king affords the subject." 1 Blackstone, Commentaries *366. But an alien falls into an "obvious division," *id.*, because he owes only a "[l]ocal allegiance" to the Sovereign, *id.* at *370, a temporary affinity "for so long time as he continues within the king's dominion and protection . . . and it ceases the instant such stranger transfers himself from this kingdom to another," *id.* Put differently, "when an alien that is in amity cometh into England, . . . he is within the King's protection; therefore so long as he is here, he oweth unto the King a local obedience or ligeance, for that the one (as it hath been said) draweth the other." Calvin's Case (1608) 77 Eng. Rep. 377,

30

383; 7 Co. Rep. 1 a, 5 b.[32] Thus, throughout the English history, "no Lawyer hath ever yet denied" that "Protection and Allegiance are reciprocal obligations," for "[t]hey are founded in Reason, Equity, and good Policy." Sir Michael Foster, Discourse on High Treason, *in* A Report of Some Proceedings on the Commission of Oyer and Terminer 183, 188 (Oxford, Clarendon Press 1762) (1714).

The Founders followed this understanding of the reciprocal relationship between allegiance and protection. Though they sometimes split over whether the principle of protection entitled aliens to the benefit of all constitutional rights, as contested during the debates over the Alien and Sedition Acts,[33] all acknowledged that some relationship between the Sovereign and the alien was essential. Leading the Democratic-Republicans, James Madison contended "[a]liens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on the one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 556 (Jonathan Elliot ed., Philadelphia, J.B.

---

[32] *See also* 77 Eng. Rep. at 392; 7 Co. Rep. at 13 a (citing Aristotle to explain that allegiance to the sovereign was compelled by the natural law).

[33] *See* Gerald L. Neuman, *Whose Constitution?,* 100 Yale L.J. 909, 927–38 (1991); J. Andrew Kent, *A Textual and Historical Case Against A Global Constitution*, 95 Geo. L.J. 463, 531 (2007) (explaining "the poles of debate in the 1790s" with "Federalists denying that any aliens had constitutional rights" and "Republicans arguing that friendly aliens resident in the United States had constitutional rights").

Lippincott Company 2d ed. 1836). And even the Federalists—who reasoned that because aliens were not part of the people for whom the Constitution was created and thus have no rights thereunder—still recognized the protection principle. *See id.* at 534 (explaining that the Alien and Sedition Acts "respect[] a description of persons whose rights were not particularly contemplated in the Constitution of the United States," so they "are entitled only to a temporary protection while they yield a temporary allegiance—a protection which ought to be withdrawn whenever they become 'dangerous to the public safety'"). Thus, despite disagreement about what laws aliens were entitled to the protection of, the principle of protection was universally accepted. And early American law adhered to this understanding.[34]

This history, and the tradition it follows, reveals three insights. First, the protection principle confers only a temporary license to aliens—a discretionary privilege to be within the land—so it cannot guarantee a right to indefinitely remain. *See* Hamburger, *supra*, at 1844–45 (explaining that allegiance and protection are "reciprocal Ties, each equally depending upon the other, and liable to be dissolved by the other's being refused or withdrawn" (quoting N.J. Const. of

---

[34] *See, e.g.*, 33 Annals of Cong. 1042 (1819) (explaining that men who "were not our citizens" and were outside "the territorial limits of the United States" "owed us no allegiance, and were entitled to no protection"); Story, *supra*, at § 7 ("[T]he laws of one country . . . can bind only its own subjects, and others, who are within its jurisdictional limits; and the latter only while they remain there."); *Eisentrager*, 339 U.S. at 769 ("Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar.").

32

1776 pmbl.; N.Y. Const. of 1777 pmbl.)). That is because "[n]atural allegiance is therefore perpetual, and local temporary only." 1 Blackstone, Commentaries *370.

Second, the relationship between the alien and the Sovereign can be terminated by "the express will of the sovereign power to order him away." *Clarke v. Morey*, 10 Johns. 69, 72 (N.Y. 1813); *see Harisiades*, 342 U.S. at 587 ("The Government's power to terminate its hospitality has been asserted and sustained by this Court since the question first arose."); Sir Alexander Cockburn, Nationality Or the Law Relating to Subjects and Aliens 138–39 (London, William Ridgway 1869) ("[B]y the law of many countries a power is vested in the Government, either for cause, or at discretion, to direct the removal of the alien."). Although "a vested right is to be taken from no individual without a solemn trial, . . . the right of remaining in our country is vested in no alien; he enters and remains by the courtesy of the sovereign power, and that courtesy may at pleasure be withdrawn." *The Address of the Minority in the Virginia Legislature to the People of that State; containing a Vindication of the Constitutionality of the Alien and Sedition Laws* 9–10 (1799).[35] So "even as to alien friends, one who is ordered away or is present without permission would be outside the public protection." Ilan Wurman, *Jurisdiction and Citizenship* 44 (May 22, 2025) (Minnesota Legal Studies Research Paper No. 25-27) (on file with Social Science Research Network).

---

[35] An address attributed to General Henry Lee and John Marshall before his time as Chief Justice. *See* Neuman, *supra*, at 930.

33

Third, a temporary license does not confer aliens access to all rights enjoyed by citizens. *See* Hamburger, *supra*, at 1976–77 (explaining that aliens who enter lawfully "have a right to the same protection as citizens, even if not the same substantive rights as citizens"). "[T]he sovereign is supposed to allow [an alien] access only upon this tacit condition, that he be subject to the laws" limited to "the general laws made to maintain good order, and which have no relation to the title of citizen or of subject of the state." Emmerich de Vattel, The Laws of Nations § 101, at 172 (Joseph Chitty ed., Philadelphia, R. & J. W. Johnson 1852) (1758). So "submitting to the laws of any country, living quietly, and enjoying privileges and protection under them, makes not a man a member of that society." John Locke, The Second Treatise of Civil Government § 122, at 61 (J.W. Gough ed., Basil Blackwell 1948) (1690). Which explains why aliens had "circumscribed" rights[36] such as a prohibition on political engagement[37] and property ownership.[38] The same thinking animated the

---

[36] 1 Blackstone, Commentaries *371.

[37] Cockburn, *supra*, at 138 (explaining the protection principle does not extend to "the exercise of political rights" which "is reserved to such as are members of the community, to the exclusion of those, who, though residing within its territory belong to another State which may have different or perhaps hostile interests to promote").

[38] *Id.* at 139–40 (tracing the prohibition on aliens owning property back to the days of King Alfred); 1 Blackstone, Commentaries *372 (explaining an alien "may purchase lands," "but not for his own use" because "[i]f an alien could acquire a permanent property in lands, he must own an allegiance, equally permanent with that property, to the king

Federalists' position that aliens cannot claim the Constitution's protection because, although the protection principle applies, the alien is not party to the Constitution. *See* Alexander Addison, On the Alien Act (Washington, John Colerick 1799) (1798), *reprinted in* Univ. of Mich. Libr. Digit. Collections 11, https://perma.cc/4GLT-2GWU (last visited Apr. 30, 2025).[39]

All told, the protection principle establishes that the Sovereign does not owe all aliens within its borders the same obligation it does its citizens. Thus, Congress may make rules for aliens that would be unacceptable if applied to citizens. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977).[40]

---

of England, which would probably be inconsistent with that which he owes to his own natural liege lord").

[39] This understanding accords with the Court's recognition that "the alien in several respects stands on equal footing with citizens, but in others has never been conceded legal parity with the citizen." *Harisiades*, 342 U.S. at 586. For example, the alien is given the same "measure of economic opportunity," ability to "invoke the writ of habeas corpus to protect his personal liberty," "protections of the Fifth and Sixth Amendments" in criminal proceedings, and right to "just compensation" for a taking that citizens receive. *Id.* at 586 n.9. But unlike citizens, an alien "cannot stand for election to many public offices," has no right to vote, does not receive an unlimited "right to travel temporarily outside the United States," and must "prove 'his right to enter or remain.'" *Id.* at 586 n.10 (quoting 8 U.S.C. § 155(a) (repealed 1952)).

[40] Arguments to the contrary violate not only precedent but the political branches' plenary power over immigration. The Court has upheld removals based on determinations that an alien's speech or association demonstrated undesirability

Under the best understanding of the First Amendment, Qatanani is not part of "the people" whom the First Amendment restricts government action against, and he cannot claim its protection. At the time of the BIA's decision,

---

sufficient to terminate the privilege of presence. *See Harisiades*, 342 U.S. at 581–83, 591–92 (rejecting the argument that the First Amendment barred removal of three based on their associations with the Communist Party); *Kleindienst v. Mandel*, 408 U.S. 753, 756–69 (1972) (upholding an alien's exclusion based on his speech the Sovereign deemed undesirable, regardless of citizens' First Amendment rights to hear that alien's speech); *Reno*, 525 U.S. at 491–92 ("When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity."). And proper respect for the political branches' plenary power over immigration has repeatedly moved the courts against second guessing their judgment. *See, e.g.*, *Reno*, 525 U.S. at 490–92 (declining to enjoin deportation proceedings based on the aliens' claim that they were selectively targeted for deportation because of their affiliations); *Galvan v. Press*, 347 U.S. 522, 523, 530–32 (1954) (upholding constitutionality of deporting an alien based on his associations with the Communist Party despite First Amendment concerns); *Kleindienst*, 408 U.S. at 769–70 (courts may neither "look behind" the "facially legitimate and bona fide" denial of immigration waiver, nor weigh it against asserted "First Amendment interests"); *United States v. Aguilar*, 883 F.2d 662, 695 (9th Cir. 1989) (rejecting an alien's claims under the First Amendment in light of "the government's overriding interest in policing its borders").

Qatanani was not subject to the protection principle. He entered the country with permission via a non-immigrant H1-B visa to work for a limited time. During those three years, Qatanani was within the country with the express permission of the Sovereign and owed temporary allegiance in exchange for a temporary license. But once the visa expired, so did the protection principle. If not then, surely when USCIS denied his initial status adjustment application or when DHS initiated removal proceedings against him. No matter what date, the Executive had removed authorization for Qatanani to remain many years before he publicly called for a new intifada.

## C.

Even if Qatanani were afforded First Amendment protection as an unauthorized alien (or even an LPR), denial (or recission) of an immigration privilege, to which he has no right or entitlement, is not a punitive or adverse action that could trigger First Amendment restrictions on government action. Through the Constitution, "[t]he people of the United States . . . limit[ed] the power of their government over themselves; but la[id] no restraint on the power of their government over aliens." Addison, *supra*, at 11. So until an alien "become[s] [a] citizen[], they are in the power of the ordinary legislature," which "may receive them, and admit them to become citizens; or may reject them, or remove them, before they become citizens." *Id.* Thus, when aliens "come here, they know, that they come at the discretion of the ordinary legislature . . . and have no reason to complain, if this legislature remove them, before they become citizens." *Id.* Put simply, an alien within our Nation as a matter of administrative grace has no right to remain.

37

That is why "[d]eportation is not a criminal proceeding and has never been held to be punishment." *Carlson v. Landon*, 342 U.S. 524, 537 (1952). Rather, "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." *Immigr. & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). So "[w]hile the consequences of deportation may assuredly be grave, they are imposed not as a punishment" but "to bring to an end *an ongoing violation* of United States law." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999).

The same is true for Executive determinations denying status adjustments because the legislature has not created a statutory entitlement to an adjustment of status under section 1255. To the contrary, Congress explicitly stated that the privilege of a status adjustment is purely discretionary and should be determined by the Executive. § 1255(a); *Elkins*, 435 U.S. at 667; *Ameeriar*, 438 F.2d at 1030. Immigration benefits differ from other benefits the Executive offers. True, neither Congress nor the Executive may condition the receipt of a government benefit in a manner that infringes constitutional rights. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213–14 (2013); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006). This principle has been applied to benefits such as "tax exemptions," "unemployment benefits," "welfare payments," and "denials of public employment." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). But legal status to enter or remain in our Nation is not an administrative benefit held out to all aliens who meet a strict set of qualifications. No. It is the highest privilege the political branches may grant to those individuals deemed, in

38

their discretion, deserving of the opportunity to work towards the common good of our republic.

By design then, immigration determinations, without more, cannot serve as adverse actions against an alien, making appeals to First Amendment limitations inapposite.

* * *

Mohammad Qatanani's case carries a simple caution: courts cannot confuse the political privilege that permits an alien's presence with an unrestricted right to indefinitely remain. That understanding spans from the earliest days of the republic to the laws Congress created to control immigration today. The uncertainty and instability that comes from residing in a foreign land is neither new nor unique to America. It is simply the cost immigrants in all places and all times have counted worth spending in deciding to leave their home country to seek a better life in another. There is nothing sinister in acknowledging that truth, nor is it any barrier to the promise that "[t]he bosom of America is open to receive not only the opulent & respectable Stranger, but the oppressed & persecuted of all Nations & Religions; whom we shall wellcome to a participation of all our rights & previleges if by decency & propriety of conduct they appear to merit the enjoyment." Letter from George Washington to Joshua Holmes (Dec. 2, 1783).

Seeing no constitutional claim or legal question that warrants granting the petition, and mindful we lack jurisdiction to review the Executive's discretionary decision not to grant Qatanani a status adjustment, I would deny the petition and so respectfully dissent.